# CASES DETERMINED

# January Term, 1916.

BRIGHT, Respondent, vs. CITY OF SUPERIOR and others, Appellants.[1]

*January 12—February 22, 1916.*

*Waters: River or arm of lake? Title to river bed: Platting and conveyance: Requisites of plat: Acknowledgment by agent: Ratification: Equity: Injunction: Protecting abstract property rights as against enterprise of great public benefit: Vacation of platted streets in Superior Bay: Election of remedies: Appeal: Direction of judgment, to avoid further litigation.*

1. That body of water which lies along the northeast front of the city of Superior, though frequently called the Bay of Superior on maps and in public speech, is in fact a widening of the St. Louis river, not an arm of Lake Superior; its bed was the subject of private ownership and platting; and the riparian proprietors might by conveyances separate the ownership of the lands on the bank from the lands in the bed of the river.

2. Secs. 1–5, ch. 41, R. S. 1849, required that a plat of lands should be certified by the surveyor and acknowledged by the proprietor and recorded. The proprietors of land in the present city of Superior caused a plat thereof to be made, acknowledged, and recorded by one B., a former owner. The surveyor's certificate recited that the plat was made and designed under the direction of one N. "as agent of the proprietors," and it was indorsed as approved by N. as such agent. Afterwards in a duly acknowledged and recorded power of attorney from the proprietors, running to N., the platted lands were described and it was stated that "the town of Superior has been laid out, surveyed and the plat thereof recorded . . . under our direction and authority."

---

[1] This case was not printed in its regular order because of the pendency therein of a motion for a rehearing, which was afterwards abandoned.—REP.

*Held*, that this was a complete ratification of the acts of B. and N., and rendered the plat a valid one under said statute.

3. An enterprise involving a great public benefit both to the municipality and to the people of an important city should not be halted and killed by the courts at the suit of an individual citizen whose abstract rights may be infringed upon, but whose injury, if any, will be inconsequential and conjectural.

4. Thus, in an action by the owner of two small vacant lots on a sandbar in the Bay of Superior, to prevent the consummation of a compromise agreement between the city of Superior and two railway companies pursuant to which the city council had passed an invalid resolution vacating a number of the platted but unimproved streets (including one upon which said lots abutted) in a certain tract of land, partly filled and partly under water, lying for the most part between the original shore line of the bay and the established harbor line,—it appearing, among other things, that the railway companies had acquired by purchase all the submerged lots involved except those of plaintiff; that his lots were distant from the shore and inaccessible except by small boats; that no use had ever been made of them, and none apparently was contemplated; and that the carrying out of the agreement and vacation of the streets would increase rather than decrease the value of plaintiff's lots and would result in a substantial benefit to the city and its people generally,—it is *held* that no injunctive relief should be granted.

5. Defendants in such action, by their answer, consented that all damages which plaintiff would sustain by reason of the carrying out of said agreement and vacation of said streets might be determined either by the court or a jury at plaintiff's election, and offered to pay such damages when so determined. The trial court, although it determined the amount of such damages, held that plaintiff was entitled to an injunction and he accepted that relief. On appeal, it being held that plaintiff was not entitled to any equitable relief, it is further *held* that although he had made his election of remedies, which would ordinarily be final, yet, the offer of defendants never having been withdrawn, this court may, in order to avoid further litigation, direct a judgment that plaintiff recover the amount of damages so determined.

APPEAL from a judgment of the circuit court for Douglas county: E. C. HIGBEE, Judge. *Reversed.*

This is an equitable action by the owner of two lots in the original plat of the city of *Superior* seeking to have set aside and declared void a certain agreement entered into by the city

with the appellant railway companies, also a certain resolution adopted by the city council carrying out said agreement and vacating certain platted streets, alleys, and harbor slips in said city, and to enjoin the defendants from asserting any rights under the agreement and resolution because of the invalidity of said agreement and resolution and because by the vacating of said streets and alleys he would be deprived of access to his said lots and thus suffer irreparable injury. The grounds on which it was claimed that the agreement and ordinance were void will appear later. The defendants by their answers denied that the alleged streets, alleys, and slips were ever dedicated to the public or accepted; alleged that the vacation resolution was validated by ch. 450 of the Laws of 1913, and that the plaintiff had an adequate remedy at law; and offered to compensate the plaintiff for any damages suffered by reason of the vacation of the streets, alleys, and slips.

The action was tried by the court. The fundamental facts were not seriously in dispute but the legal inferences therefrom were. The facts, either as found by the court or as established by the evidence, will now be briefly stated.

In the year 1854 W. W. Corcoran and others who owned government lots 1, 2, and 3 in section 19, town 49, range 13 west, fronting on St. Louis river (or Superior Bay, as it is more frequently known), Douglas county, Wisconsin, caused a plat thereof to be made and acknowledged by one Becker, their agent and the former owner of the lands, dividing the same into blocks, streets, avenues, alleys, slips, and piers. This plat was called the "Plat of Superior Western Division" and was recorded in the register's office in September, 1854, and is the original and only plat of that part of the city of *Superior* contained within the limits of said government lots which has ever been made. It has always been treated as a valid plat. All real estate within its limits has been sold and conveyed with reference to it and all taxation and public improvements of every nature have been based upon it. The

plat covered a large area of solid ground stretching back south-
west of the river (or bay), and on it stands the eastern part
of the city of *Superior* with many houses, stores, and other
buildings constructed on, and with reference to, the lots and
blocks laid out on the plat.   In a word, the city has been
built upon the plat, and the streets, lots, and blocks marked
thereon have been accepted by private owners and public au-
thorities.   The plat extended out into the waters of the river
or bay more than a thousand feet, and this part was divided
into lots, blocks, slips, and piers substantially as if the same
were on land.   The water front thus platted was more than a
mile in length.   A better idea of the situation may perhaps
be gained from examination of the sketch here inserted, which
reproduces the substantial features of that part of the plat
specially involved in this litigation, it being remembered that
the railroads and "harbor line" were nonexistent in 1854.

For many years there was no improvement of this water
front.   The streets and public ways on land were opened up
and improved, but so far as the submerged part of the plat
was concerned it remained as it was when platted, being any-
where from three feet to ten feet under water.

In the year 1881 the Northern Pacific Railroad Company,
predecessor of the *Northern Pacific Railway Company,* built
a line of railroad on piling or trestle work across the platted
lands about 300 feet from shore approximately as represented
on said sketch, and at some time later the defendant *Great
Northern Railway Company* built a line of railway nearer
shore, substantially as shown in the sketch.   As early as 1896
the trestle work supporting the *Northern Pacific* track was
filled in with dirt, leaving seven or eight openings through
which small boats could pass.   After the year 1898 the entire
space between the *Northern Pacific* track and the shore was
filled in and switch tracks constructed on a considerable part
of the filled ground.   In the year 1899 the United States gov-
ernment fixed a harbor line as indicated in the sketch and
dredged a deep-water channel for navigation purposes outside

of this line, pumping the sand so dredged back into the water on the shore side, thus forming islands or sand-fills along the southern edge of the harbor line some 300 feet in width and

of various lengths. A part of one of these islands is indicated in the sketch, and the plaintiff's lots, two in number, 25 by 120 feet each in size, are situated upon this island at the place indicated in the sketch. The city of *Superior* also established a harbor line, which in this locality coincides with the harbor line fixed by the United States government. The plaintiff bought one of his lots in October, 1911, and the other in May, 1913. It seems to be admitted that at some time prior to 1910 the defendant railway companies acquired by purchase all the submerged lots involved in the vacation proceedings except the lots owned by the plaintiff, also that they acquired the easement to cross the street ends which the tracks crossed. For a number of years prior to 1910 there had been a controversy between the city of *Superior* and the defendant railway companies as to the rights of the public in the streets, alleys, and slips marked upon the plat of the submerged lands, and in the last-named year a suit was brought by the city against the railroad companies to determine the city's rights therein, which suit was thereafter removed to the proper federal court. After the removal active negotiations were had between the city authorities and the railroad companies with a view of compromising the conflicting claims of the public and the companies with regard to the streets and alleys aforesaid. These negotiations were given great publicity in the newspapers and the subject was considered and discussed by various business organizations of the city. After long discussion and negotiation an agreement of compromise between the city on one side and the railway companies on the other was formulated which provided in substance (1) that the city should vacate all but four of the platted streets in a rectangular piece of land about a mile and one-half in length, bounded on the southwest partly by the line of Second street and partly by a line indicated by the dotted line upon the sketch aforesaid, on the harbor side by the "harbor line," on the southeast end by the dotted line indicated in the sketch, and on the

northwest end by a line running from a continuation of Second street and, at right angles therewith to the harbor line. The southwest part of this territory consisted principally if not wholly of filled land covered with the defendants' railroad tracks, and the remainder consisted of submerged land except where the islands aforesaid formed by dredging rise above the surface of the water; (2) that four streets running across the territory aforesaid from southwest to northeast were not to be vacated, to wit, R. street and L. street (both being on the northwest part of the territory and not shown on sketch) and Carlton avenue and St. John avenue (see sketch), beginning at the line of the alley outside of First street and running to the harbor line; (3) that the city should reserve perpetual easements for sewer purposes under two streets not appearing on the sketch; (4) that the railway companies should convey to the city the submerged land between Carlton avenue and St. John avenue beginning at the line of the alley outside of First street and extending to the northeast line of the plat, also another tract of larger size and similarly located near the northwest end of the tract but not shown on the sketch; (5) that the railway companies should within three years construct a viaduct for pedestrians and vehicles over all tracks at L. street; (6) that the companies should also construct viaducts at R. street and at Carlton or St. John avenue (as the city might choose) when necessity and convenience require them as determined by the Wisconsin railroad commission; (7) that the companies should lay out and dedicate a diagonal street forty feet wide beginning in First street at Nettleton avenue and extending to the property transferred to the city between Carlton and St. John avenues, and remove all railroad tracks from the said street except one lead track. The agreement contained other provisions not necessary to be quoted here and provided that the action should be continued to the January, 1914, term of court, that the council should pass the vacation resolution, and

that if the Wisconsin legislature should pass a validating act
(a copy of the proposed act being attached to the agreement)
and the time limit fixed in the act should expire without ac-
tion challenging the vacation being brought, the vacation
should. be deemed completed. The proposed validating act
consisted of a section amending sec. 926—125$q$, Stats. 1911,
so as to provide that no action should be brought to set aside
an order theretofore made vacating streets or public grounds
(where appearance had not been made nor damages claimed
in the preliminary proceedings) unless commenced within six
months from the passage of the act. This agreement was
executed by the railway officials in January, 1913, and was
then thrown open to public discussion in *Superior.* The
newspapers published its terms with plats showing the effect,
public hearings were had before the city council, the matter
was considered by various business clubs and commercial or-
ganizations of the city, and the proposed settlement met with
universal approval. After this public discussion and consid-
eration and on March 17, 1913, the resolution of vacation was
passed by the council and on the following day the agreement
was executed by the city officers. This action was commenced
in May following. The proposed act was submitted to the
legislature but was not passed as drawn, but was passed
June 6, 1913, with some modifications, as will appear by con-
sulting ch. 450, Laws 1913 (sec. 926—125$q$, Stats. 1913).
These modifications consisted of provisions at the end of the
section to the effect that such orders should be deemed vali-
dated at the end of the six months except as they might be in-
validated by actions *then pending,* and that in any such ac-
tion, if the plaintiff's interest could be fully compensated in
damages, the damages should be assessed and paid and the
action terminated thereby without affecting the validity of
the vacation. In October, 1913, the city and the railway
companies made a supplemental agreement modifying the
original agreement, by which the companies agreed to pay all

damages assessed against the city in any action brought to challenge the validity of the vacation proceedings and confirmed the original agreement as so modified. The following specific findings made by the court are quoted in full because they state the facts covered by them as briefly and satisfactorily as they can be stated:

"That the streets in question sought to be vacated have none of them ever been opened, improved, or traveled as streets.

"That the compromise agreement in question and the vacation resolution have caused no physical change to be made in the streets, or in the means of reaching the lots in question. There has been no physical closing of the platted streets and none has been threatened.

"That the lots in question are vacant and unoccupied, they always have been vacant and unoccupied, no use has ever been made of them, and there is no evidence to indicate what if any use the plaintiff intends to make of the lots.

"That the plaintiff's lots are not by themselves and in their present condition suitable or adapted for any commercial use; that if the terms of said compromise agreement could be carried out and said lots combined with other lands so as to form a large and compact tract suitable for docks and warehouse purposes, the value of said lots would be very considerably enhanced.

"That the damage which would result to plaintiff's lots by the vacation and closing of the streets pursuant to the terms of said ordinance and the interest of the plaintiff can be fully compensated in money damages.

"That the lots in question cannot now be reached except by passing over navigable water, and there is no evidence that the city will ever cause the platted streets in question to be filled or improved, either as filled streets or as water slips.

"That the lots of the plaintiff at the time of the filing of the plat were under eight or ten feet of water in the Bay of Superior, subsequently they were filled in by sand pumped from the government channel in the Bay of Superior, but said lots are still surrounded by waters more than 300 feet in width and eight or ten feet in depth."

Judgment was entered perpetually restraining the city officials from carrying out the terms of the resolution of vacation, and the defendants appeal.

For the appellant *City of Superior* the cause was submitted on the brief of *H. V. Gard* and *T. L. McIntosh.*

For the appellants *Northern Pacific Railway Company, Great Northern Railway Company,* and *Eastern Railway Company of Minnesota* there was a brief by *Hanitch & Hartley,* attorneys, and *C. W. Bunn,* of counsel, for *Northern Pacific Railway Company,* and *John A. Murphy,* attorney for *Great Northern Railway Company* and *Eastern Railway Company of Minnesota;* and the cause was argued orally by *Louis Hanitch, J. A. Murphy,* and *C. J. Hartley.*

For the respondent there was a brief by *D. E. Roberts* and *Olin, Butler, Stebbins & Stroud,* and oral argument by *Mr. Roberts, Mr. Ray M. Stroud,* and *Mr. Michael S. Bright.*

The following opinion was filed March 6, 1916:

WINSLOW, C. J. It is conceded that the resolution of vacation was void at the time of the passage because of the entire lack of the petition and the notice to property owners which are required by the statute. Secs. 927, 904, Stats. 1913. This renders it unnecessary to consider any of the other grounds upon which the validity of the resolution and the agreement which preceded the resolution are challenged. The resolution being void when passed, its execution can, of course, be enjoined by a court of equity at the suit of one who, under established legal principles, suffers thereby an injury for which there is no adequate remedy at law and who seasonably brings his action. The conclusion which we reach on the merits of the plaintiff's claim renders unnecessary any decision as to the validity or applicability to the present litigation of the validating act referred to in the statement of facts, viz. ch. 450 of the Laws of 1913, and we make no comment upon it.

The vital question in the present case is whether the plaintiff has shown himself to be such a person as is last above described.   This question is answered by the appellants in the negative because they say (1) the submerged lands attempted to be platted were and are a part of the bed of Lake Superior and hence were not the subject of private ownership or platting, and consequently the supposed streets do not exist and the plaintiff has no lots; (2) in any event the plat was not executed in accordance with the requirements of the statute and hence did not operate as a dedication of the streets marked thereon to public use; and (3) the plaintiff has not shown himself to be injured but rather benefited by the vacation of the streets in question.   These propositions will be discussed in their order.

1. Was the submerged land platted a part of the bed of Lake Superior, or of the St. Louis river? The circuit judge, who gave this case the most careful and painstaking consideration, concluded (contrary to his first impressions) that it was a part of St. Louis river, and we fully agree with his conclusion.   The fact that the plaintiff's lots "are covered by the waters of St. Louis river" was affirmatively alleged in the answer of the railroad companies, while in the answer of the city it is said that the plaintiff's lots "were platted on the navigable waters of the Bay of Superior or St. Louis river." However, the question seems to have been treated as an open one in the trial court and it seems better that it should be so treated here.   The question is whether that body of water about seven miles long and from three quarters of a mile to a mile in width, commonly known as Superior Bay, which lies along the northeast front of the city of *Superior,* is a widening of St. Louis river, or an arm of Lake Superior.   The situation will be better understood by referring to a map of the westerly end of Lake Superior.   It will be seen that there juts out from the extreme west end of the lake, immediately in front of the city of Duluth on the Minnesota shore, a long

and narrow tongue of land seven miles or more in length, in a southeasterly direction, forming the northeast boundary of the so-called Superior Bay.   Another tongue of land extends in a northwesterly direction from the Wisconsin shore, and these two tongues of land are known respectively as Minnesota Point and Wisconsin Point.   Their ends are separated by a 500-foot channel locally known as the Superior entry. This channel is and has always been recognized as the mouth of the St. Louis river, and through it (though now deepened and enlarged by dredging) the waters of that river have always been discharged into Lake Superior.   The proof is plenary and convincing that this channel has been recognized by the national and state governments and by the people generally as the mouth of the St. Louis river from a very early period.   In the map made by J. N. Nicollet (which is part of a report covering explorations and hydrographical surveys made under the authority of the United States War Department in the years 1836 to 1839, published in 1843 as part of Senate Document No. 237, second session of the 26th Congress) the body of water in question is plainly represented as a part of the river and the words "Fond du Lac Superior" (*bottom* or *farthest part of Lake Superior*) appear just outside of the above described channel or entrance, printed upon the space representing the body of the lake.   Following this comes the direct governmental recognition and adoption of this map in the Wisconsin enabling act of 1846.   In this act the boundaries of the proposed state are specifically traced and at this point are given as follows: "thence through the center of Lake Superior to the mouth of the St. Louis river; thence up the main channel of said river to the first rapids in the same, above the Indian village, *according to Nicollet's map.*"   The same boundary line is given in the constitution of Wisconsin (art. II, sec. 1), and the enabling act for Minnesota, passed in 1859, recognizes and adopts the same line. The government survey was made in 1853, and the field-notes

show that the aforesaid channel between Minnesota and Wisconsin Points was recognized by the surveyors in fixing their meander lines as the mouth of the St. Louis river. A lithographed map of the new city, published in 1856 by the proprietors of the plat, while designating the body of water as the Bay of Superior, bears also the words "St. Louis river" printed upon a part of the center portion of the so-called bay where the channel would naturally be. In a chart of Lake Superior published by the United States War Department in 1870 the mouth of the aforesaid channel is designated as the mouth of the St. Louis river.

It is true that the body of water in question is frequently called the Bay of Superior both on maps and in public speech, but we regard this as very natural and entirely inconclusive. As matter of fact there always was a channel in the central part of this so-called bay through which the waters of the river always moved towards the lake; that the river is continuous from its source to its entrance into Lake Superior through the channel aforesaid and has always been so considered, seems to our minds well proven. It follows from this that the bed was the subject of private ownership and that the riparian proprietors could separate the ownership of the lands on the bank from the lands in the bed by conveyances. *Norcross v. Griffiths,* 65 Wis. 599, 27 N. W. 606; *Kelley v. Salvas,* 146 Wis. 543, 131 N. W. 436, and cases cited.

2. This brings us to the question of the execution of the plat and its validity as a statutory dedication. The statute (secs. 1–5, ch. 41, R. S. 1849) required that the same should be certified by the surveyor and acknowledged by the proprietor and recorded, and should then operate to vest the land intended for streets, alleys, ways, commons, or other public uses in the city or town in trust for the uses and purposes set forth and expressed or intended. It is undisputed that this plat was not signed or acknowledged by the proprietors (W. W. Corcoran and others), but by the former owner, one

Becker. The surveyor's certificate recites that the plat was made and designed under the direction of William H. Newton "as agent of the proprietors," and it is indorsed as approved by "William H. Newton, agent of the proprietors." It appears that on April 12, 1855, there was recorded in the office of the register of deeds a duly acknowledged power of attorney from Mr. Corcoran and his fellow proprietors, running to William H. Newton and R. R. Nelson, authorizing them, among other things, to cause certain lands owned by the proprietors, including the lands in the plat in question, to be surveyed for the purpose of making division of the same among the owners, to make partition thereof among such owners, and to convey the same in parcels to the several owners. In this power of attorney all the lands owned in common by the parties, including the platted lands, are described, and it is stated upon part thereof "the town of Superior has been laid out, surveyed, and the plat thereof recorded in the office of the register of deeds of said county of Douglas under our direction and authority."

It cannot be doubted that the proprietors, by duly executed power of attorney, could have authorized Becker and Newton to make acknowledgment and record the plat. *Nelson v. Madison,* 3 Biss. 244; *Bushnell v. Scott,* 21 Wis. 451. It is a familiar rule that what may be authorized in advance may be subsequently ratified, provided the ratification be of the same nature and executed with like formality as that required for conferring authority in the first instance. 2 Corp. Jur. p. 485, sec. 103; 1 Mechem, Agency (2d ed.) secs. 419, 420.

We see no escape from the conclusion that there is here a complete ratification of the previously unauthorized plat. Newton and Becker had attempted to make and record a valid plat as agents of the proprietors, and the proprietors by a duly executed, acknowledged, and recorded instrument afterwards certify to the world that the land was surveyed and the plat recorded under their direction and authority. It is diffi-

cult to see what further could have been done to make a good
ratification. This conclusion renders unnecessary any con-
sideration of the question whether the defendants are in any
position to raise this objection, a matter about which there
may be some doubt arising from the fact that the existence of
the streets has been recognized by both the railroad companies
and the city in the most unequivocal manner through all the
litigation from the time the city commenced its action against
the railroad companies in 1910 down to the present time.
Indeed, if the streets do not exist and never have existed, the
elaborate agreement entered into between the city and the
railroads as well as the subsequent vacation proceedings would
seem to be the veriest nonsense. *Ashland v. C. & N. W. R.
Co.* 105 Wis. 398, 401, 80 N. W. 1101.

Nor is it necessary to consider the effect of the various gen-
eral validation acts passed for the purpose of curing the de-
fects existing in ancient plats and obviating the serious re-
sults to innocent purchasers which might follow from a de-
cision holding such plats to have been defectively executed in
the first instance. Secs. 1299$j$, 1299$k$, and 2216$b$, Stats.
We entertain no doubt that the plat must now be considered
as a valid statutory plat.

3. Has the plaintiff shown himself entitled to relief in
equity? This is perhaps the most serious question in the
case. We pass the contention made by the appellants that
the plaintiff is not a purchaser in good faith; he will be
treated as such. The situation then is substantially this: he
owns two adjoining lots, each 25 by 120 feet in extent, on a
sand-bar several hundred feet ·from shore, surrounded by
water on every side; whether riparian rights go with the lots
is an unsettled and doubtful question; they are not now and
never have been used; there is not now and never has been
any access to them by land; they have lain there for sixty
years, most of the time quietly sleeping at the bottom of the
river, but finally elevated to the light of day by the kindly as-

sistance of the United States government as an incident to the making of a channel for navigation; no public authorities have ever improved or thought of improving the mythical streets and alleys marked on the map which are formally vacated by the resolution in question; to improve them would mean also the filling in of the lots and blocks between and would involve great expense; so far as appears another sixty years would probably pass before the municipal authorities would feel justified in undertaking such a task; neither the public nor the plaintiff have ever had any way of access to the lots except by small boats nor have they apparently desired any other method of access; it does not appear that the plaintiff has any use for the lots, and, if he had, the vacation of the so-called streets does not affect the prospect of future access to them in any way.

The overwhelming weight of the evidence taken on the subject is to the effect that the vacation of the streets and alleys in the submerged part of the plat did not substantially affect the market value (so far as there can be a market value) of the lots. The reasons for this opinion are apparent and easily understood. The city stands at the head of probably the greatest inland waterway in the world, the gateway between the water system of the Atlantic and the railroad systems of the Pacific; its future, if it has a future, must be commercial and industrial, and it must necessarily depend in a very large degree upon the utilization of this wonderful landlocked water front. Transportation and manufacturing interests of the present day demand large unobstructed areas for their development; the day of the small enterprise of this nature is gone, probably never to return. If this water front is to be utilized, the existing subdivisions into small lots and blocks with frequent streets must disappear in one way or another. Hence the witnesses are quite unanimous in concluding that, if there be any change in the value of the plaintiff's lots resulting from the vacation proceedings, it is more likely

to be an increase rather than a decrease, and we see no reason to doubt the correctness of their conclusion. On this general subject the trial judge in his written opinion very aptly says:

"For the sixty-one years that have elapsed since the platting no use whatever has been made of the plaintiff's premises; no income has been derived therefrom and there is no intimation that any use of them is intended. In fact it is clear that unless combined with other lots so as to form a large compact tract they are valueless for any commercial purpose. Each of the two lots is twenty-five feet in width and they might be utilized for the site of a small boathouse, and if the scheme of the compromise agreement between the city and the railroad companies could be carried out the lots could probably be sold for more than they are now worth to be incorporated into a large tract suitable for dock and warehouse purposes."

No fair-minded person can carefully read the testimony and come to any other conclusion, as it seems to us. So we meet the question whether an enterprise involving a great public benefit both to the municipality and the people of an important city should be halted and killed by the courts at the suit of an individual citizen whose abstract rights have been infringed upon, but who will either suffer no injury or whose injury will be inconsequential and conjectural. This question has been met by numerous courts including our own and has been universally answered in the negative. In *Mahler v. Brumder,* 92 Wis. 477 (66 N. W. 502), at page 486 it was said: "Equity should not be successfully invoked merely to inflict injury or damage to the defendant, without securing any substantial right or benefit to the plaintiff;" and in the recent case of *Gimbel Bros. v. Milwaukee Boston Store,* 161 Wis. 489, 154 N. W. 998, it is said: "The present or threatened injury must be real and not trifling, transient, or temporary. . . . Courts generally exercise their discretion against issuing an injunction, where it will produce great public or private mischief, merely to protect technical, doubtful, or unsubstantial rights," citing many cases from other

jurisdictions.    See, also, *Schuster v. Milwaukee E. R. & L. Co.* 142 Wis. 578, 126 N. W. 26.    This doctrine seems to us eminently sane and sensible.    It seems that it is not always remembered that courts are instituted and maintained not for the purpose of delicately poising the scales of abstract logic and recording results, but rather of aiding in the attainment of the ends of government by vindicating rights that are real. Especially is this true of a court of equity.    In a case like the present its function is unquestionably to prevent a substantial wrong to the citizen, not to use its high powers to prevent an act which merely infringes upon an abstract or theoretical right but causes no substantial injury to any one; and in this latter situation the court, it seems, may well consider as controlling the fact (if it be a fact) that the threatened act will result in a substantial benefit to the municipality and its people generally.

In the present case the evidence seems to us to demonstrate that the plaintiff's injury is academic rather than real, or at most so insignificant in its character that no injunctive relief should be granted.

While we have had no difficulty in reaching this conclusion on the evidence before us it has not been entirely clear to us what form the judgment should take.    If there be even slight damages they ought to be assessed either in the present action or in an action at law brought for that purpose after the dismissal of the present action.    There has already been one long and expensive trial of this case; manifestly it would be desirable for both parties if the whole matter could be now closed and the necessity of another trial of the present action or the bringing of a new action obviated.    We are of opinion that under the circumstances present in this case this may well be done.

The defendants have in effect stipulated and agreed to pay any damages found to exist by the trial court.    Their answers contained a formal offer and consent that the damages might

be determined in the present action either by the court or by a jury at the plaintiff's election, and further, "these defendants hereby agree that this answer may stand as an agreement on the part of these answering defendants *to pay such damages* if any when they shall be so fixed and determined, and hereby offer and agree to assure the payment of such damages to be so fixed and determined by undertaking or deposit with the court, in such amount and in such manner as may be ordered by the court upon motion of the plaintiff." No undertaking or deposit was in fact made, and the court at the close of the case agreed with the plaintiff that he was entitled to equitable relief instead of money damages. Strictly speaking, the plaintiff doubtless exercised his election and refused the offer, yet the offer has never been withdrawn and still remains in the pleadings. The trial judge in his written opinion considered it his duty to make findings as to the damages and concluded as follows:

"But assuming that he has rights beyond the limits of his lot lines, the utmost value that can be put upon them is $750 apiece, and it is my judgment, from all the evidence, that a liberal allowance for damages in case the vacation proceedings are ultimately sustained is one third of the value of the lots."

It will be noticed that this allowance is based on the assumption that the lots extend to the harbor line, an assumption about which there may be much doubt.

While this was evidently considered a finding of fact by the trial judge, it was for some reason not inserted in the formal findings of fact.

Doubtless, under the offers contained in the answers the plaintiff might have accepted this sum and entered judgment upon it. He chose not to do so, however, and accepted the equitable relief awarded by the court. He is now held on defendants' appeal not to have been entitled to this equitable relief. While it is true that an election of remedies once made is ordinarily final, we think it entirely within the power of

this court, in view of the fact that the offers have never been revoked or withdrawn, to utilize and act upon them now in order to shape a final decree which shall avoid the necessity of further litigation. No harm can be done to the plaintiff by this course, for he will obtain more damages than he has in fact suffered; no harm will be done to the defendants, for they have consented thereto in advance; further litigation and expenditure of money will be avoided and equitable principles will be in every true sense observed and enforced.

The judgment will be that the judgment of the trial court be reversed, and the action remanded with directions to enter judgment awarding the plaintiff a recovery of $500 against the defendants, and in all other respects dismissing the complaint on the merits without costs to either party. But one bill of costs to be taxed by the appellants in this court.

*By the Court.*—It is so ordered.

VINJE, J., took no part.