[L. A. No. 6119.  In Bank.—February 18, 1920.]

## JOHN HAYES, Petitioner, v. LORIN A. HANDLEY et al., etc., Respondents.

[1] STREET LAW—LOS ANGELES—IMPROVEMENTS UNDER SPECIAL AS-SESSMENT PLAN — NONCOLLUSIVE AFFIDAVIT ACCOMPANYING PRO-POSALS—CHARTER INAPPLICABLE.—The requirements of section 207b of article XX of the charter of the city of Los Angeles that every proposal to perform a contract with the city shall have thereon or attached thereto the affidavit of the bidder that the proposal is noncollusive, does not apply to contracts for street improvements paid for under the special assessment plan, in view of the fact that such section is an inseparable part of an article containing several sections which relate exclusively to the execution and performance of contracts with the city wherein the contract price is paid directly by the city, and in view of the fact that under the charter amendment of 1917 the city is authorized to adopt any state law in the improvement of its streets.

[2] MUNICIPAL CORPORATIONS—LOS ANGELES—CONSTRUCTION OF TRAF-FIC TUNNEL—PAYMENT BY SPECIAL ASSESSMENT.—Sections 6 and 8 of article XI of the constitution, as amended in 1914, and subdivision 51 of section 2 of article I of the charter of the city of Los Angeles, do not so isolate the city from the rest of the state as to prevent it from constructing a traffic tunnel and providing for defraying the cost of such improvement by special assessment, under the Street Improvement Act of 1913 and the amendatory act of 1917.

[3] ID.—CONSTRUCTION OF TRAFFIC TUNNEL—RIGHT OF CITY.—The con-struction of a traffic tunnel by a municipal corporation is a use which may be made of city streets without additional compensa-tion to the abutting owner.

[4] STREET LAW — LOS ANGELES — SIGNING OF NOTICES FOR STREET WORK—AUTHORITY OF PRESIDENT OF BOARD OF PUBLIC WORKS—SUFFICIENCY OF AUTHORIZATION.—Under the charter of the city of Los Angeles, a notice of street work signed by the president of the board of public works pursuant to a general order of the board made several years before authorizing the president to sign such notices, sufficiently complies with the charter provision au-thorizing the president to sign notices "on the order of the board," since the giving of the notices is mandatory upon the board and it is without discretion in the matter.

[5] ID.—STREET IMPROVEMENT ACT OF 1913—PUBLICATION OF NOTICE —SELECTION OF NEWSPAPER.—Under the Street Improvement Act

of 1913, which requires the publication of notice of street work in a newspaper, but does not designate who shall select the paper, the publication by the board of public works of the notice in a newspaper selected by the city council substantially complies with the requirements of the statute.

[6] ID.—NOTICE INVITING BIDS—SUFFICIENCY OF SIGNING AND PUBLICATION.—The requirement of the provision of the Street Improvement Act of 1913 that the legislative body of the municipality should cause the notice inviting bids for work to be published in a newspaper designated by it is sufficiently complied with where the city council directs the board of public works to give the notice and designates the paper for publication, and the secretary of the board under a previous general order authorizing him to sign such notices signs the same, and causes the notice to be published in the designated paper.

[7] ID.—CONTRACT FOR CONSTRUCTION OF TRAFFIC TUNNEL—AUTHORITY OF BOARD OF WORKS OF LOS ANGELES—CHARTER.—The board of public works of the city of Los Angeles has authority to contract for the construction of a traffic tunnel under that portion of section 145 of the charter which gives the board power to make contracts for "work" in or upon streets.

[8] ID.—EXECUTION OF CONTRACT FOR TUNNEL CONSTRUCTION—MANDAMUS — APPROVAL OF SALE OF BONDS BY CAPITAL ISSUES COMMITTEE UNDER WAR FINANCE CORPORATION ACT — UNNECESSARY ALLEGATION.—A petition for a writ of *mandamus* to compel a board of public works to enter into a contract for the construction of a traffic tunnel need not allege that the capital issues committee had approved the sale of the bonds to be issued in payment for the proposed work of construction, since under the "War Finance Corporation Act" the powers of such committee are purely advisory.

[9] ID.—REGISTERED LANDS—FAILURE TO SUBJECT TO LIEN OF ASSESSMENT—PROCEEDING NOT INVALIDATED.—Proceedings for construction of a traffic tunnel are not invalidated by the failure to subject lands included in the assessment district registered under the Land Title Act of 1914 to the lien of the assessment by properly filing with the registrar a notice of the ordinance passed to construct the tunnel, but the effect of such omission is merely a question of practical interest to the contractor.

APPLICATION for a Writ of Mandamus to compel a municipal board of public works to enter into a contract for tunnel construction. Writ granted.

The facts are stated in the opinion of the court.

Albert J. Sherer and Robert Young for Petitioner.

Charles S. Burnell, City Attorney, Wm. P. Mealey, Assistant City Attorney, and Hartley Shaw for Respondents.

LENNON, J.—This cause is a proceeding in *mandamus,* originally instituted in the court of appeal of the second appellate district, wherein the petitioner prayed for and was granted a peremptory writ of mandate directed to and commanding the defendants, as the board of public works of the city of Los Angeles, to enter into a contract upon behalf of the city with the petitioner for the performance of certain public work. The basic facts upon which the petition for the writ rests and the writ itself depends are succinctly stated in the opinion of the district court of appeal as follows:

"The city council of the city of Los Angeles, on the twenty-sixth day of October, 1917, duly passed and adopted an ordinance of intention, which was afterward approved by the mayor, the principal purpose of which was to provide for the construction of a traffic tunnel from a point where Second Street intersects Hill Street in said city, westerly and under Second Street as the same now is laid out and established over and across elevated ground. As an incident to this improvement, the ordinance also provided for changing of grades in portions of intersecting streets, the building of stairways and appropriate tunnel approaches, a description of which work was fully set out in the ordinance. The ordinance also described a district to be benefited by the improvement and provided that special assessments be made to pay the costs and damages. The ordinance further provided as follows: 'That the proceedings for the aforesaid improvement shall be had and taken under an act of the legislature of the state of California, designated and known as the "Street Improvement Act of 1913," approved June 16, 1913, and under all acts supplementary thereto or amendatory thereof.' It contained a further provision that bonds should be issued in accordance with the provisions of the same act. Notice was given by the board of public works of the municipality of the contemplated work, and after protests were made and regularly disposed of, the work was by ordinance ordered to be

done and the board of public works, pursuant to direction of the ordinance, advertised for bids for the doing thereof. The petition further sets forth that petitioner was the lowest responsible bidder and that his bid was duly accepted by said board of public works. Petitioner alleges further that said board refused without cause to enter into a contract with petitioner or to approve the sufficient bond offered by him. Hence this proceeding.''

While counsel say in their briefs that the cause was submitted for decision to the court of appeal upon the demurrer to the petition, the record before us does not say so nor does the record show the interposition of a demurrer. However, in view of the fact that the record does not show the presentation of a pleading by the defendants which joined issue with the facts pleaded in the petition, we will assume, as we did in the first instance, in furtherance of expediting the termination of a controversy which so largely involves public interest, that the case did go off upon demurrer and that, therefore, no questions of fact were considered by the court of appeal save those presented by the petition and admitted by the demurrer.

All of the points made in opposition to the writ save one were disposed of by this court upon the first hearing in favor of the contention of the defendant, and that one point related to the sufficiency of the noncollusive affidavit, which was drafted and attached to the bid of petitioner with the apparent purpose of meeting the requirements of section 207b of the charter of the city of Los Angeles. Assuming, as we were induced to believe by the original briefs of counsel, that such an affidavit was required by said section as part of the jurisdictional proceedings for the consummation of a contract of the character of that in controversy here, we did no more than consider and determine the efficacy of the affidavit measured by the requirements of the charter section. At this point it may not be amiss to note the fact that the petition for the writ, as originally prepared and presented to the court of appeal, made no specific mention of the making of the noncollusive affidavit required by said section 207b, but, after the case was partially briefed in the court below and before it was submitted for decision, paragraph 54 of the petition was, by stipulation of counsel, industriously amended by the addition of a paragraph which

averred the making of a noncollusive affidavit and set out the language thereof. The making of this amendment to the petition by consent of counsel for the parties to the proceeding indicates very clearly that it was the then belief of all of the counsel in the case that the preparation and presentation of a noncollusive affidavit was, as a matter of law, an essential requisite to the validity of petitioner's bid and the jurisdiction of the defendant board to enter with the petitioner into the contract in controversy. This conclusion is confirmed by the fact that counsel for the defendants throughout their briefs here, and in the court of appeal, iterated and reiterated the contention, without evoking from counsel for the petitioner any contention to the contrary, that section 207b of the city charter covered and controlled contracts of the character in controversy here, and, consequently, compelled conformity, literally or substantially, with its provisions before such a contract could be consummated. Indeed, it may be said that counsel for petitioner conceded the correctness of this contention and sought to avoid the effect of it only upon the theory that, while the noncollusive affidavit in question was not in the exact language of the section, nevertheless its language was sufficiently comprehensive to meet the test of a substantial statement of the facts required by the section and was, therefore, sufficient to confer jurisdiction upon the board to consummate the contract. The discussion in the briefs of the sufficiency of the affidavit was confined solely to a consideration of that single section of the charter as if it, and it alone, was the section of the charter which controlled the situation. No mention was made, nor hint given, of the existence of other sections of the charter to which said section 207b was rightly and inseparably related and dependent upon for a proper understanding and construction of its scope and effect. As a consequence of counsels' inexplicable neglect in this particular, we were, as doubtless was the court of appeal in the first instance, impressed with the belief that it was an admitted and undisputed fact in the case that section 207b of the charter was a separate, independent provision thereof, and accordingly considered it as having application to the contract in controversy. Now, upon petition for rehearing, counsel for petitioner, with no pretense of apology for their failure to heretofore fully and

explicitly discuss and develop this phase of their case, for the first time make the point that section 207b of the charter of the city of Los Angeles does not apply to contracts for street improvements paid for under the special assessment plan. In support of the point thus made, our attention is directed, for the first time, to the fact that said section is an inseparable part and parcel of article XX of the charter, and that it is only one of several sections of that article which relate exclusively to the creation and consummation of contracts with the city wherein the contract price is to be paid directly by the city.

Article XX of the charter is entitled "Contracts and the Sale of Property." It originally consisted of one section only; in 1911 it was adopted as a separate charter amendment in the form in which it now exists. (Stats. 1911, p. 2145.) Standing alone the provisions of section 207b are undoubtedly broad enough to cover and control contracts with the city generally, but when considered in connection with the other sections of the same article it seems too plain for argument that it was not the legislative intent that said section should apply to contracts initiated under the special assessment plan, which was the character of the contract here involved. The first section of article XX (section 207), requires, in effect, that, where the expenditure is over five hundred dollars, with certain exceptions, the contract must be in writing, approved by the city attorney as to form; there must be an authorization by a two-thirds vote of the city council in cases of an expenditure in excess of one thousand dollars. Section 207a prescribes certain conditions which must be complied with to render binding upon the city those contracts the form of which is regulated by the preceding sections, to wit, the publication of notice inviting proposals for the performance of contracts; furnishing of a bond for the faithful performance of the same; letting of the contract to the lowest bidder, etc. Then follows section 207b, which provides that "Every proposal to perform a contract with the city, or with any board, commission or officer thereof shall have thereon, or attached thereto, the affidavit of the bidder that such proposal is genuine, and not sham or collusive, or made in the interest or in behalf of any person not therein named, and that the bidder has not directly or indirectly induced or solicited any other

bidder to put in a sham bid . . . or to refrain from bidding. . . .'' By section 207c the amount of expenditure which such officer, commission, or board may contract for each month is limited to one-twelfth of the fund apportioned to such officer, commission, or board for the fiscal year. Section 207d, the last section of article XX relating to the execution of contracts, regulates the purchasing of materials for the city. Of course, it would be violating the elementary rules of statutory construction to hold that section 207b, which was adopted simultaneously with the adoption of the other sections of the same article, should have a different scope and effect than those sections with which it appears. In other words, the true meaning of section 207b can be arrived at only by a consideration of it in its connection with and relation to the statute as a whole. Construing together, then, section 207 and the succeeding sections of article XX, relating to the making of contracts and considering their applicability to the letting of contracts for street improvements, it cannot be questioned that sections 207, 207c, and 207d deal in terms only with contracts for which the city is liable in its corporate capacity out of the public funds as distinguished from moneys raised by special assessment. We find in section 207a a scheme for the letting of contracts which includes the time of advertising, the nature and character of the advertisement, the provision that the notice must specifically reserve the right to reject any and all bids and provisions with relation to the execution of the contract and bonds, which are not only inconsistent with the Street Improvement Act of 1913 (Stats. 1913, p. 954), but inconsistent with all the various statutes for improvement of streets theretofore passed by the legislature and with those in force in the city of Los Angeles in 1911. This leads to the conclusion that it was not contemplated by these charter amendments of 1911 to make the same applicable to street improvement contracts where the improvements were to be paid for by local assessments. It thus appears that four of the five sections under consideration apply only to general contracts of the city. [1] So considered, the conclusion inevitably follows that section 207b of article XX of the charter of the city of Los Angeles does not apply to contracts for such improvements made under special proceedings to be paid for by local assessment.

A further consideration leading to the same conclusion results from the amendment to the charter of the city of Los Angeles, which was adopted in 1917. (Art. I, sec. 2, subd. 19, and particularly subd. c thereof, Stats. 1917, pp. 1691, 1692.) The city is thereby authorized to make any necessary improvements upon its public streets and to pay for the same by special assessment. The amendment, besides authorizing the city to adopt a procedure ordinance therefor, provides that such powers "shall be supplemental, additional and alternative" to the general laws of the state conferring upon municipalities the power to make such improvements. The city council was thereby empowered to adopt, as was done in the present case, the provisions of the Street Improvement Act of 1913 as the basis for the street improvement proceeding. As this general law provides a complete method of procedure, including the method of advertising for bids and letting of contracts, if the requirements there set out are complied with, the contract executed in pursuance thereof must be upheld. It is true that an express provision of the charter requiring all contracts for street improvements, whether let by assessment methods or otherwise, to be let upon bids only where the bids are accompanied by the noncollusive affidavits might nevertheless be held to be valid and applicable because not inconsistent with the state law. But that is not the question we have under consideration here, which is what was the intent of the people of Los Angeles and of the legislature in the adoption of the provisions of the charter with reference to the letting of contracts. Not only do the terms of section 207 et seq., but also the terms of the amendment just discussed, confirm us in the conclusion that there was no intention in those sections to deal with contracts for street improvements to be paid for by special assessment, and we hold, therefore, that the affidavit in question was a wholly unnecessary appendage to petitioner's bid and was in nowise an essential prerequisite to the letting of the contract.

The remaining points presented in opposition to the petition are sufficiently disposed of in the opinion originally filed here and will stand as stated in that opinion as follows:

[2] "While it is admitted that the charter of the city of Los Angeles authorized the construction of a tunnel such

as that now proposed, nevertheless it is contended that the
municipality is without authority to provide for defraying
the cost of such improvement by special assessment. It
cannot be denied that the authority to levy a special assess-
ment for this purpose is conferred by the Street Improve-
ment Act of 1913, and the amendatory act of 1917, pur-
suant to which the city council of the city of Los Angeles
purported to act. The board insists, however, that the city
cannot take advantage of the authority so conferred. In
this behalf the board relics upon sections 6 and 8 of article
XI of the state constitution, as amended in 1914, and upon
subdivision 51 of section 2 of article I of the charter of the
city of Los Angeles. These constitutional and charter pro-
visions, it is contended, have the effect of so completely
isolating the city of Los Angeles from the rest of the state
of California that if its charter gives it powers concerning
any municipal affair it has those powers, but if its charter
is silent as to any such power, no general law can confer
it. That such, however, is not in all respects the effect of
the provisions referred to has recently been declared in *Cole
v. City of Los Angeles,* 180 Cal. 617, [182 Pac. 436].
Adopting the decision in that case as controlling herein, we
hold that if the legislative body of the city of Los Angeles
is indeed supreme by virtue of the constitutional and
charter provisions above noted, and if, without affirmative
action on the part of the legislative authority of the city, no
general law with relation to municipal affairs has any bind-
ing effect therein, it is nevertheless true that the legislative
body of the city has power to adopt any state law appli-
cable to its municipal affairs and that in the matter of pro-
viding for defraying the expense of the proposed work of
construction that was effectively done by the ordinance of
intention and the ordinance ordering the work to be done.

[3] "It is next contended that the construction of the
tunnel will create an additional servitude upon the land of
abutting owners. Addressing itself to a somewhat similar
question, this court said in *Colegrove Water Co. v. City of
Hollywood,* 151 Cal. 425, 429, 430, [13 L. R. A. (N. S.) 904,
90 Pac. 1053, 1055] : 'The right of the abutting owner is,
of course, always subordinate to the rights of the public.
In city streets the easement of the public is, as a result of
the condition of urban life, more extensive than in roads

through sparsely inhabited regions. In cities it is customary to devote not only the surface of the street and the space above the street to public use, but the municipality may, and frequently does, occupy the soil beneath the surface for the accommodation of sewers, gas and water pipes, electric wires, and conduits for railroads. Where the city undertakes to occupy the space above or below the surface of the street for any purpose within the scope of the public uses to which highways may be put, the use of the owner of the fee must yield to the public use.' It is well settled that the manner and extent of such public use is not limited by any standard of methods of use in vogue at the time of dedication. 'On the contrary,' said this court, in *Montgomery* v. *Santa Ana etc. Co.*, 104 Cal. 186, 191, [43 Am. St. Rep. 89, 25 L. R. A. 654, 37 Pac. 786, 788], 'we affirm that when a public street in a city is dedicated to the general use of the public, it involves its use subject to municipal control and limitations for all the uses and purposes of the public as a street, including such methods· for the transportation of passengers and freight as modern science and improvements may have rendered necessary, and that the application of these methods, and, indeed, of those yet to be discovered, must have been contemplated when the street was opened and the right of way obtained, whether by dedication, purchase, or condemnation proceedings, and, hence, that such a user imposes no new burden or servitude upon the 'owner of the abutting land.' While the precise question, namely, as to whether or not a tunnel for traffic is a reasonable street use, has never been determined in this state, it has, apparently, been assumed without question in a number of recent cases that if the city has legislative authority to construct a traffic tunnel, the rights of abutting property owners would not stand in the way of its construction on the theory that an easement is being asserted not contemplated by the original dedication. (*Gassner* v. *McCarthy*, 160 Cal. 82, [116 Pac. 73]; *Mardis* v. *McCarthy*, 162 Cal. 94, [121 Pac. 389]; *Thompson* v. *Hance*, 174 Cal. 572, [163 Pac. 1021].) Authorities from other jurisdictions, moreover, confirm the conclusion that traffic tunnels must be recognized as a necessary part of a modern system of highways. We find the supreme judicial court of Massachusetts stating its opinion as follows in a well considered

and carefully reasoned case: 'Our system, which leaves to
the land owner the use of the street above or below or on
the surface, so far as he can use it without interference
with the rights of the public, is just and right, but the
public rights in these lands are plainly paramount, and
they include, as they ought to include, the power, to appro-
priate the street above or below the surface, as well as upon
it, in any way that is not unreasonable, in reference either
to the acts of all who have occasion to travel or to the effect
upon the property abutters. The increase of requirements
for the public within the streets of our large cities has
probably equaled, if it has not surpassed, the increase of
requirements for business along the streets. The legisla-
ture, the guardian of public interest and of private rights,
has determined that the space below the surface of certain
streets in Boston is needed for travel. The question is,
whether action under the statutes involves an acquisition of
a new right as against the land owner, or only an appro-
priation and regulation of existing rights. It hardly can
be contended that this is an unreasonable mode of using the
streets in reference either to travelers or abutters. If it is
not an unreasonable mode of using them, the mere fact that
it deprives abutters of the use of vaults and other similar
underground structures in the streets, which they have here-
tofore maintained, is of little consequence. Abutters are
bound to withdraw from occupation of streets above or be-
low the surface whenever the public needs the occupied
space for travel. The necessary requirements of the public
for travel were all paid for when the land was taken, what-
ever they may be, and whether the particulars of them were
foreseen or not. The only limitation upon them is that
they shall be of a kind which is not unreasonable. In the
present case the travel which is being provided for is from
place to place within the city. There are stopping places
on the subway at convenient points. In that respect it is
different from a tunnel designed only or chiefly for travel
for long distances. The new method is a substitution in
part of a subterranean use of the streets for the use of their
surfaces for the same general purposes. It is impracticable
to have direct communication between the premises of
abutters and the cars in the tunnel, but by going a short
distance access to them may be had from any place. We

are of the opinion that this use of the streets is within the purposes for which the lands were taken, and that no additional servitude is created by it.' (*Sears* v. *Crocker et al.,* 184 Mass. 586, [100 Am. St. Rep. 577, 69 N. E. 327].) We concur in this conclusion and decide that the construction of the proposed tunnel will be within the right of the city as acquired under the dedication of the ground for street purposes.

"Defendants make several points touching the validity of the notices published by the board of public works. First, with respect to the notice of street work, it is insisted that the board failed to act in the manner required by law in causing the notice to be published and failed to properly designate the paper in which publication was to be made. The notice in question was signed by the president of the board and was published for the period of time required by law in the paper designated for such publication by the city council. It is urged by defendants that the president of the board was without authority to execute the notice and that the board itself should have designated the paper in which it was published. With reference to the first objection, it appears that, while there was no special order passed by the board directing the president to sign the notice of street work, the board had undertaken to authorize that officer to sign such notices by a general order passed some years before. Defendants' counsel earnestly questions the power of the board to make such a general order, arguing that the charter provision authorizing the president to sign notices 'on order of the board' requires independent action by the board upon each separate case as it arises. The argument that, by the general order referred to, the board undertook to abandon the exercise of the discretion reposed in it by law and to delegate its duties to the president would doubtless have much force were the signing of such notices a discretionary act. (*Meuser* v. *Risdon,* 36 Cal. 239, 244.) But the publication of such notices was mandatory upon the board and no discretion in the matter was left in that body. In the instant case the law and the order of the city council required the board to make the publication of the notice and the act was of a perfunctory nature and of a purely ministerial character. [4] The general order of the board authorizing the president to per-

form such a perfunctory and ministerial duty was clearly sufficient. Addressing ourselves to the second objection, namely, that the board failed to designate the newspaper in which the notice was published, we find it admitted that there is no provision of the Street Improvement Act or of the charter which directs that the newspaper in which the notice is to be published shall be formally designated and no provision declaring what officer shall select the newspaper. The law does, in effect, provide that the board shall cause the notice to be published, and this provision, it is true, might well be construed as authorizing the board to designate the paper. [5] However, the publication of the notice was, in fact, made in the newspaper designated by the city council as the one in which the notice of intention should be (and was) published, and this, we think, was a substantial compliance with the requirement of the statute. Had the power to make or withhold publication of notice been vested in the board, it may be conceded that a failure to make a formal order designating the paper for publication might have created a substantial defect in the proceedings for the reason that the board would have had power to abandon the proceedings. (*Stanwood* v. *Carson,* 169 Cal. 640, 648, [147 Pac. 562].) But here the board had merely a perfunctory statutory duty to perform, and it performed that duty when it published the notice in the paper designated in the ordinance of intention.

[6] "Similar objections are made to the notice inviting bids. The city council directed the board of public works to give the notice and designated the paper for the publication. The secretary of the board signed and posted the notice and caused it to be published in the designated newspaper. It is first contended that this procedure did not amount to a compliance with the requirement of the Street Improvement Act that the legislative body of the municipality should cause the notice to be published in a paper designated by it. The obvious answer is, that the legislative body of the city of Los Angeles did designate the newspaper in which the notice was published and that it did cause the posting and publication by directing the board of public works to perform the ministerial acts connected therewith. This direction was natural and proper in view of the fact that the board was the body which had charge of the

street improvement work in the city and which, moreover, had independent authority, under section 145 of the charter, to perform those acts. It is 'further objected, however, that the board failed to make an order authorizing the notice to be given and that the notice should have been signed, not by the secretary, but by the president of the board. The notice was signed by the secretary pursuant to a general order of the board which directed that officer 'to post, with specifications, and to publish all notices required by law to be posted and published, and in strict accordance therewith, whenever the city council of the city of Los Angeles shall by ordinance order any work of street improvement or sewer construction to be done under the general street law of the state of California, and shall in such ordinance direct the board of public works to post and to publish notices inviting sealed proposals or bids for doing said work.' We consider this authorization sufficient. While it is true that the formal acts of the board must in general be executed by the president (or, in his absence, by two members of the board), we are of the opinion that it was competent for the board to dispense with such formal execution and to direct the secretary to act in the matter in the case of the performance of a purely perfunctory and ministerial duty in which the board must act virtually without discretion. The existence of such authority is confirmed, we think, if further confirmance is necessary, by subdivision (e) of section 143 of the city charter, which provides that the secretary of the board shall post and publish all notices ordered by the board. The objection that the order referred to was a general one is answered by the fact that the action of the board, being purely ministerial, a special order was wholly unnecessary. It is finally objected that the general order is insufficient for the reason that it does not specifically refer to notices concerning tunnel work. The order was general in its nature, however, and its evident purpose was to include all work of improvement of the general character proposed by the ordinance here considered.

[7] "It is next objected that the award of contract was made to the petitioner by the board of public works, whereas, it is insisted, it should have been made by the city council. Petitioner contends that the power to award the

contract was vested in the board by that portion of section 145 of the city charter which reads as follows: '(a) The Board of Public Works shall have and exercise all the powers and duties that are now or may hereafter be conferred or imposed by law upon the city council relating to: 1. The advertising for and inviting of proposals or bids for doing any work ordered by the city council to be done in or upon any streets, avenues, lanes, alleys, courts or places, or in the construction of any sewer or drain, ordered by the city council in or over the right of way granted or acquired for such purpose; 2. The examining, considering and declaring of such proposals or bids; 3. The awarding, letting or re-letting of contracts for doing any of said work so ordered, the giving notice of such award, the rejection of proposals or bids for doing such work, and the granting of extensions of time for the completion thereof by the contractor therefor.' Defendants, on the other hand, deny the applicability of these charter provisions in the instant case on the ground that the words 'work . . . in or upon any streets, avenues, lanes, alleys, courts or places' are not sufficient to include the work of constructing a traffic tunnel under a street. We are of the opinion, however, that the construction of a tunnel is naturally and properly to be described as 'work in' the street and as such is sufficiently covered by the words of the charter provision above quoted.

[8] "It is also urged that the proceedings, as set forth in the petition, were in violation of that portion of the 'War Finance Corporation Act,' which deals with the powers of the capital issues committee as to the issue of securities by corporations. (April 5, 1918, c. 45, sec. 203, 40 Stats. at Large, 513, [U. S. Comp. Stats. (Ann. Supp. 1919), sec. 3115 4/5m; Fed. Stats. Ann., 2d ed., Supp. 1918, p. 107].) In this behalf it is insisted that the demurrer to the petition should have been sustained for the reason that it does not appear therefrom that the committee had determined that the sale or offering for sale or for subscription of the bonds to be issued to pay for the proposed work would be compatible with the national interest. As we construe the statute in question, it merely conferred upon the committee power, which it might but need not exercise, to investigate, pass upon and determine whether or not the sale of any securities which, at the time of the passage of the act, had

not passed beyond the control of the obligor issuing the same was compatible with the national interest. Such a determination having been made, the powers of the committee apparently terminated, congress evidently deeming the force of public opinion sufficient to prevent the marketing of securities whose sale was considered inadvisable by the committee. Upon this view of the matter, the powers of the committee are to be regarded as purely advisory in their nature, and, had its sale of the bonds proposed herein been withheld, no legal impediment would have been placed in the way of the issuance and sale of these securities. It follows that it was not incumbent upon petitioner to allege that the committee had approved the sale of the bonds to be issued in payment for the proposed work of construction.

[9] "It appears from the petition that the boundaries of the assessment district described in the ordinance of intention included land registered under the Land Title Act of 1914. (Stats. 1915, p. 1932.) Defendants contend that the land so registered has not been subjected to the lien of the assessment by reason of an alleged failure to properly file with the registrar a notice of the ordinance passed to construct the tunnel. It is not necessary to pass upon the merits of this contention, for, even assuming its soundness, it does not afford the basis for a defense in the present proceeding. We may assume that all registered land within the assessment district remains at the present moment free from any lien, and, since the petition does not state how much of the land in the district is registered, we may further assume that it is all registered. 'On this assumption,' asserts counsel for defendants, 'there is at present no land which is legally assessable for this improvement, and since it is not proposed to pay for the improvement otherwise than by levying assessments the whole proceeding must fall.' The conclusion that the whole proceeding must fall is unsupported by argument or authority. The failure, if any, to file the notice which would subject the registered land in the district to the lien of the assessment certainly did not affect the power of the city to proceed in the matter. The opening of the proposed tunnel is concededly a municipal affair and no provision has been called to our attention in the charter or ordinances of the city the effect of which would be to make a failure to file a notice pursuant to the

requirements of the Land Title Act a jurisdictional defect. Nor, in view of the fact that any unregistered lots included within a district containing registered land will only be assessed in accordance with benefits received, is there any necessity of considering such a failure a jurisdictional defect in the absence of a positive legislative declaration. This being so, whether or not there is any land in the district subject to the lien is merely a question of practical interest to the contractor, who must look to such liens to satisfy his claims, and if 'the whole proceeding must fall,' it must fall, not by reason of any technical legal defect, but because, as a practical matter, no contractor will take his chance on his ability to enforce the lien of the assessment on sufficient land to pay him for his work.''

The peremptory writ of mandate is granted as prayed for.

Olney, J., Lawlor, J., Angellotti, C. J., and Kerrigan, J., *pro tem.*, concurred.