**COUNTY OF SANTA BARBARA,**
Plaintiff,

v.

**UNITED STATES of America, Defendant and Third-Party Plaintiff,**

v.

**GOLETA COUNTY WATER DISTRICT,**
Third-Party Defendant.

Civ. No. 65–267–IH.

United States District Court
C. D. California.

June 7, 1967.

Robert K. Cutler, County Counsel, Susan Trescher, Deputy County Counsel, Santa Barbara County, Santa Barbara, Cal., for plaintiff.

William M. Byrne, Jr., U. S. Atty., James R. Akers, Jr., Asst. U. S. Atty., Los Angeles, Cal., for the United States.

Robert M. Jones, of Price, Postel & Parma, Santa Barbara, Cal., for third-party defendant.

## OPINION and ORDER

IRVING HILL, District Judge.

The instant controversy is between the County of Santa Barbara, California (Plaintiff) and the United States (Defendant). The question presented is which of the two must bear the cost of relocating certain water-distribution lines owned by the United States and located within County road easements and along and under County highways.

The United States, as part of the Cachuma Reclamation Project, owns a water-distribution system which delivers water from the Project to the Goleta County Water District. A portion of these distribution lines lie along and under two County highways, Patterson Avenue and Hollister Avenue. Many decades ago the County secured road easements for these roads from the owners of the underlying fees. The roads were in operation long before the Cachuma Project and the water-distribution system in question were ever thought of. In 1952 the United States entered into a contract with the Water District to supply water to the District. It was expedient to run the distribution lines along and across the existing County roads. Before beginning construction of the lines, the United States approached the County and secured a franchise (which will be discussed in detail infra) permitting the location of the water lines within the County's road easements and along and under its roads. The United States also secured its own pipeline easements from the fee owners of the land on which the County roads are built. Some of the owners granted easements to the United States; but in most cases, the United States obtained its easements

in a condemnation action. The condemnation action did not purport to condemn any interest held by the County under the County's pre-existing road easements. In fact, both the condemnation complaint and judgment expressly provided that the easements being condemned, and the estate being taken by the United States, were "subject to existing rights-of-way for highways [and] roads."

The United States then commenced the construction of the water-distribution system, which it completed by September of 1955. There is no doubt but that the County knew precisely where the United States was locating its distribution lines and approved of their location wherever the lines were laid along and under the County highways. When constructed, these water lines did not interfere with the County's roads or the County's use and exercise of its road easements as the County roads existed at that time.

The parties lived in happy relationship with each other until 1963. Then the County determined that improvement of parts of Patterson and Hollister Avenues was necessary for the safety and convenience of the travelling public. The improvement involved realigning, widening and regrading parts of those streets. The Government concedes that the decision to improve the roads was a reasonable and proper decision. To accomplish the improvement, it was necessary to relocate some of the Government's pipes and other water facilities. Aware of the time lag involved in court litigation, the parties decided to get the job done pronto and litigate at their leisure. The relocation work was done under an agreement which said it was being done without prejudice to the legal position of any party. The County seeks recovery from the United States of the amount the County paid toward the cost of the work.[1] The trial was held on a stipulated statement of facts and issues.

I hold that the United States must bear the entire cost of the relocation.

At the threshold of the controversy, we encounter the problem of what law governs the case. The County contends that every aspect of the case is governed by state law. The United States contends that "federal law" is applicable but does not spell out the source of the alleged "federal law" or what it is. The cases cited by the United States to support its contention are mostly cases involving the supremacy clause of the Constitution in which state regulation was held to interfere with and impair the ability of the United States to carry out a federal function. No one would dispute the applicability of federal case law if any such question were involved in this case. But, as I see it, this case involves no such question. Cf. Alameda County v. United States, 124 F.2d 611 (9th Cir. 1941). This case involves the acquisition by the federal government of an interest in land and its rights vis-a-vis the owner of other rights or interests in the same land.

Where the United States acquires an interest in land by deed, the Ninth Circuit has held that state law must be followed in determining the nature and extent of the interest which the Government has thus acquired. Coos County Sheep Co. v. United States, 331 F.2d 456, 460 (9th Cir. 1964); Los Angeles & S. L. Ry. v. United States, 140 F.2d 436 (9th Cir. 1944), cert. denied, 322 U.S. 757, 64 S.Ct. 1264, 88 L.Ed. 1586 (1944). Neither case, however, appears to have involved a dispute between the parties as to whether state or federal law governs. However, no authority has been cited, and none has been found, indicating that federal law governs such a question.

Where the United States acquires an interest in land by condemnation, there appears to be a substantial diversity between the various Circuits on whether federal or state law governs in a case

---

1. By a third-party complaint, the United States also seeks to have the Goleta District indemnify it if the United States is held liable. The trial was bifurcated and this matter will be tried later.

involving the nature and extent of the rights acquired. Some Circuits have said that "federal law" applies. See, e. g., Bumpus v. United States, 325 F.2d 264, 266 (10th Cir. 1963); cf. United States v. Pinson, 331 F.2d 759, 760 (5th Cir. 1964). In neither case was the conflicts question apparently disputed between the parties and in both cases no "federal law" was found so the Court eventually resorted to "general law".

Other Circuits have said that state law must be applied. United States v. Becktold Co., 129 F.2d 473, 477 (8th Cir. 1942); United States v. 19.86 Acres of Land, 141 F.2d 344, 346, 151 A.L.R. 1423 (7th Cir. 1944); Carmichall v. United States, 273 F.2d 392, 394 (5th Cir. 1960) (thus the Fifth Circuit appears to have enunciated both rules).

At least one Circuit has said that the Court may choose between federal and state law and will "normally" apply state law unless there is a compelling requirement of nationwide uniformity. United States v. Certain Property, 344 F.2d 142, 144 (2nd Cir. 1965).

■ I have determined to apply state law. This determination rests on several bases: The decisions of our Circuit (the Ninth) tend in that direction; I find no requirement for national uniformity in a problem of this type and I believe that state law should be applied. In this case the United States has acquired no rights by deed or condemnation from the County. It acquired rights from others, in land in which the County also holds an interest. The precise question becomes the nature of the obligation, if any, owed by one holder of rights in land to the owner of other rights in the same land. There is no need for, or justification for, superseding state law in such a case simply because the federal government is involved.

But even if I were required to apply "federal law" in the present case, the United States is not benefited. The Government has found no federal substantive law on the questions presented here. As in Bumpus and Pinson, both cited supra, I would have to then resort to "general law" for decision of the case. So far as I can determine, the "general law" and California state law are identical and we are thus back to state law as the basis for decision. So let us proceed to examine the applicable state law.

If this controversy were one between the County, as road-easement holder, and a private citizen who owned the underlying fee (or who held an easement from the owner of the fee) and who had laid pipes along or under the County road, the County would clearly prevail under California law. I will first discuss the cases on which that conclusion rests and then discuss whether the result is different because the United States, rather than a private citizen, is involved.

■ Under California law it is clear that when a public body owns a road easement and has built its road thereon, the owner of the underlying fee may use the subsurface of the road for some improvements of his own if such use does not interfere with the public body's present exercise of the road easement. Colegrove Water Co. v. City of Hollywood, 151 Cal. 425, 90 P. 1053, 13 L.R.A., N.S., 904 (1907). But in this case, the County does not challenge the validity or propriety of the Government's construction of the water lines as of the time they were constructed. The County knew of, and approved, where and how the water lines were being built and the lines clearly constituted no interference with the County's use of its road easement when they were built.

■ It is likewise clear under California law that a public body holding a road easement does not limit its use thereof by the extent of its initial use. To the contrary, if, having built one kind of a road, it later reasonably decides to enlarge, widen or regrade that road, it may do so and the owner of the underlying fee may not object. Hayes v. Handley, 182 Cal. 273, 282, 187 P. 952, 955 (1920); Airways Water Co. v. County of Los Angeles, 106 Cal.

App.2d 787, 236 P.2d 199 (1951). As stated in *Airways*:

"With changing conditions of travel, a city has the right to adapt and appropriate its highways from time to time to such uses as in its judgment will be most conducive to the public good." 106 Cal.App.2d at 790, 236 P.2d at 201.

In *Hayes*, the public body, holding a road easement, proposed to change the existing surface road to a traffic tunnel. The underlying fee owner objected, claiming that the new use was an increased servitude for which he should be separately compensated. The California Supreme Court held that the new use was within the rights granted by the original road easement.

The above cases leave only one important question unanswered. Does it make any difference if the owner of the underlying fee has properly built his own subsurface improvements and has them in operation at the time the public body decides to increase the use of its road easement, and must his subsurface improvements, proper and non-interfering when built, yield to the requirements of the new increased road use?

The answer appears from the decided California cases. In Fallon v. City and County of San Francisco, 44 Cal.App.2d 404, 112 P.2d 718 (1941), the City had a road easement for Market Street. The owner of the underlying fee had built a hotel on his property adjoining the street and the basement of the hotel extended out to the existing curb line of Market Street, without interfering with the City's then use of its road easement. Thereafter, the City decided to widen Market Street and push back the curb line. As a result, the hotel basement became an interfering use and would have had to be pulled back to conform to the new curb line. The fee owner sought to enjoin the street widening, but the Court affirmed the sustaining of a demurrer without leave to amend, saying that the fee owner's rights were "subordinate to the paramount right of the public to make any reasonable use" of its road easement.

■ Another California decision which merits discussion is Airways Water Co. v. County of Los Angeles, supra. In that case, Plaintiff was a public utility water company whose water lines were placed underground along Anza Avenue prior to its dedication as a public street. Plaintiff had an easement from the fee owners for the purpose. Thereafter, Plaintiff and the fee owners joined in granting a road easement to the County in apparent reliance on the County's plan to pave a rather narrow portion of the street. Under the proposed plan, the water mains would not interfere with the street use and would not have to be disturbed. But after the road easement was granted, the County changed its mind and decided to make the street wider than originally projected, requiring relocation of Plaintiff's water main. The holding is that Plaintiff was required to pay the cost of the relocation. The holding may be limited as resting upon the fact that Plaintiff was a grantor of the road easement; and in granting it, failed to provide that any relocation of its existing water pipes required by use of the road easement would be at the grantee's expense. In the case at bar, the United States has granted no road easement to the County and it cannot be charged with having omitted protective language from its own instrument of conveyance. But I think *Airways* should be more broadly interpreted. As I read the opinion, it stands for the proposition that one who has erected subsurface improvements along and under the road easement of a public body, believing them to be non-interfering, takes the risk of having to move his subsurface improvements if and when they do interfere with an expanding public use of the road easement. If the effect of a public road easement is that the public body may at any later time reasonably change the conditions, method and extent of its use, it follows that the cost of having to relocate such improvements if they interfere with later

increased use of the road easement is part of the risk taken by the builder thereof even if his improvements do not interfere when built.

We come now to the question of whether any different result ensues from the fact that the United States, rather than a private citizen, is a party to the case. The question must be answered in the negative.

The Government argues that because its water lines are in furtherance of a constitutionally valid activity, it may not be required to pay the cost of moving them. This attempt to use performance of a federal function to override the usual consequences and obligations of property ownership is not new. In some respects the Supremacy Clause relieves the Government as land owner from usual obligations such as real estate taxes, zoning and other regulatory activities which would impair the performance of constitutional functions. But in the context of the present case, the Government's position is not well founded. A similar claim was made and rejected almost sixty years ago in United States v. Boston Elevated Ry., 176 F. 963 (D.Mass.1910).

In that case, the United States was the lessee of a building on Brattle Street in Cambridge, Massachusetts, which it used for a post office. The city had a road easement for Brattle Street. The lessor was also the fee owner of the land underlying the road easement and had placed the basement of his building beyond the boundaries of the structure and out into the area covered by the road easement. The basement apparently did not interfere with the road as then constructed. However, some time later, the city decided to build a subway under Brattle Street which necessitated removing this part of the basement. While admitting that removal of the basement would clearly be required if it was occupied by a private person, the Government sought to enjoin the removal. It argued that it had superior rights because it was the federal government and because the basement was being used to perform a federal function. In denying the injunction, the court said:

"If the government has only [lessor's] rights in the premises, it is without any right to oppose the construction of the subway * * *. It claims, however, in virtue of its paramount authority, a right to use the premises and to use every part of them which transcends any right that a mere owner of abutting property could assert.

\* \* \* \* \* \*

In the mere fact that the department has established a post office in the premises I am unable to find any strong support for the government's position. * * * [N]o reason appears for believing that such establishment accomplishes of itself any appropriation or dedication of the site selected to public uses, or any interference with existing rights therein.

\* \* \* \* \* \*

If the government had purchased these premises from the owner, it would have acquired no greater rights in so much of them as lay under Brattle Street than it acquired under its agreement with the owner. It does not seem to be disputed that it might have obtained the whole site, whether within or without Brattle Street, by using its right of eminent domain. * * * Had the department chosen to adopt those means, it would have extinguished, so far as it was concerned, all other rights in every other part of the premises, whether belonging to the city * * * or the defendant railway company. * * * Instead of assuming any such burden, the department contented itself with acquiring for a term the owner's rights in the premises by agreement with him. To hold that establishment of a post office and occupation and use of the site so enlarged the rights obtained from the owner as to make them * * * practically equal to those which might have been obtained by condemnation, would seem to involve the conclusion that the United States might dispense altogether, in many sup-

posable cases, with condemnation proceedings and with just compensation." 176 F. at 967–970.

Similarly, in the instant case, the United States could have insured that it would not be required to move its water lines by condemning so much of the County's road easement rights as was required to guarantee that result. But it did not choose to condemn such rights and thus, as against the County, stands in no different position than a private citizen would stand under the facts here.

In this connection, it is worth noting that the Government's ownership of these water lines is only a nominal ownership. If one looks to substance rather than form, the Government's interest in the lines is that of a mortgagee rather than an owner. The Government built the water lines for the Goleta County Water District pursuant to a contract between the District and the Government. Under the contract the District operates and maintains the lines and is obligated to reimburse the Government for the cost of constructing them. When they are paid for, title to them will be vested in the District, apparently without further consideration. Thus, there is even less reason in this case to accord some special status or rights to the Government because a federal function is involved.

Reference was made in the early portion of this opinion to the franchise which the United States secured from the County. The franchise furnishes an additional and separate ground to support the decision here made. The pertinent language of the franchise is set forth in the margin.[2] A reading of the document discloses that it employs form and language customarily used in franchising public utilities to operate along, under and across city or county streets and roads. The Government concedes in its brief that it is a "franchisee" as that term is customarily used (Government's Memorandum of Points and Authorities, p. 6).

▮ Under California law, one who accepts a franchise from a governmental body to build water lines under or along public streets impliedly consents, as a condition of the franchise, to pay the cost of relocating its facilities if the public body later changes the road so as to require such relocation. East Bay Municipal Utility Dist. v. County of Contra Costa, 200 Cal.App.2d 477, 19 Cal.Rptr. 506 (1st Dist. 1962); County of Contra Costa v. Central Contra Costa Sanitary Dist., 225 Cal.App.2d 701, 37 Cal.Rptr. 767 (1st Dist.1964).

▮ In an effort to escape the effect of the two California cases immediately

2. "[T]he right and authority is hereby granted to the United States acting through its officers, agents, employees and contractors, and to its assigns, to enter upon and to excavate in and otherwise encroach upon the highways and highway rights of way of the County within the area comprised by the Goleta County Water District, * * * and to construct and permanently to operate and maintain thereon, and from time to time hereafter to repair, alter, improve and replace water distribution lines and appurtenant facilities in and on said County highways and highway rights of way, for delivery of water to lands within the said Water Districts and sections, provided that the United States shall, during the course of work in the exercise of the authority hereby conferred, provide such barricades, lights and warning devices or signalmen as may be necessary for the protection of the traveling public, and upon the completion of such work the United States shall restore the County highways and highway rights of way, if disturbed, to the nearest practicable equivalent of their previous condition, and provided further, that all of the foregoing shall be done to the reasonable satisfaction of the Road Commissioner of this County.

IT IS FURTHER PROVIDED, that the County of Santa Barbara does not by this grant waive any of its rights to damages against the Bureau of Reclamation, which might arise from negligence or wrongful operations by the Bureau under the foregoing grant.

This grant is subject to the rights of the owners of the fee simple absolute title to the real property underlying the County highways and highway rights of way affected thereby."

above cited, the Government argues that those cases rest on a police-power doctrine rather than on a doctrine of implied contractual obligation. Some small comfort is furnished to the Government by police-power language contained in two earlier California cases dealing with the problem of who must bear relocation costs of utility lines. See Los Angeles County Flood Control Dist. v. Southern California Edison Co., 51 Cal.2d 331, 333 P.2d 1 (1958); Southern California Gas Co. v. City of Los Angeles, 50 Cal.2d 713, 329 P.2d 289 (1958), cert. denied 359 U.S. 907, 79 S.Ct. 583, 3 L.Ed.2d 572 (1959).

But we must apply the doctrine as it is now enunciated in the most recent state court authorities and we read the recent cases as resting on an implied contractual basis and as fully applicable to the United States. On this basis, the learned discourse in the Government's brief to the effect that the County police power may not validly be applied to the United States Government, is irrelevant. The United States accepted the franchise from the County and received valuable rights thereunder, including the right to enter upon, excavate and break up the surface of County roads for the purpose of laying its pipe lines under them, without any payment to the County other than the obligation to repair the roads and put them back in the "nearest practicable equivalent of their previous condition." It does not strain the sense of equity of this Court to hold that in accepting this franchise and in consideration of the benefits derived under it, the Government became obligated to the implicit condition of such franchises as declared by the state courts, i.e. the obligation to pay the cost of relocating its improvements whenever the County's later road improvements so required.

It follows from the above that the County is entitled to a judgment as prayed against the United States for its costs of relocation, with interest from November 2, 1964. The facts have been stipulated to; this opinion will constitute the Court's Conclusions of Law. Counsel for the County will prepare an appropriate Judgment and submit the same to the United States Attorney for approval as to form. Such Judgment shall reach the Court within ten (10) days from the date hereof.

■ Both parties ask the Court not only to decide who must pay the costs arising from the work already done, but also to declare who will bear the cost of relocation if similar situations occur in the future. I must decline to decide future controversies which do not now exist and may never exist. If and when they exist, the facts may be different, new state statutes may be applicable and new decisions of the California courts may have been announced. Absent such new factors, the principles of law enunciated herein should enable the parties to resolve future problems as they arise.

The Court must now determine the issues raised in the Government's third-party complaint for indemnity. In accordance with the Agreed Statement of Facts and Stipulation for Submission of Cause and Order Thereon filed August 24, 1966, Third-Party Plaintiff shall have thirty (30) days from this date within which to submit a memorandum of points and authorities; Third-Party Defendant shall have thirty (30) days from the date of service upon it of said memorandum within which to file its points and authorities; and Third-Party Plaintiff shall have thirty (30) days thereafter within which to file a reply memorandum. Upon the filing of said reply memorandum, the Third-Party Claim shall stand submitted upon the Agreed Statement of Facts.

It is further ordered that the Clerk serve copies of this Order, by United States mail, this date on all parties to this action.