Muscoda Bridge Company, Respondent, vs. Worden-Allen Company and others, Appellants.

*April 6—May 8, 1928.*

78

80

For the appellants Worden-Allen Company and Joseph McCarty Construction Company there were briefs by *Bottum, Hudnall, Lecher, McNamara & Michael* of Milwaukee, attorneys, and *Suel O. Arnold* of Madison, assistant attorney general, and *Daniel H. Grady* of Portage, of counsel, and oral argument by *F. L. McNamara* and *Geo. B. Hudnall.*

A separate brief in behalf of the appellants was also filed by *Daniel H. Grady,* of counsel.

For the appellants Village of Muscoda and Town of Eagle a brief was filed by *Grady, Farnsworth & Walker* of Portage.

A brief on behalf of the State and Richland County was filed by the *Attorney General, Suel O. Arnold,* assistant attorney general, *Adeline J. Meyer,* and *Van R. Coppernoll,* district attorney for Richland county.

For the respondent there was a brief by *Kopp & Brunckhorst* of Platteville, and oral argument by *A. W. Kopp.*

CROWNHART, J. The facts in this case are not seriously in dispute. The controversy arises largely over the conclusions of law to be drawn from the facts.

The history of the present system of highway legislation begins with the year 1911, when the state highway commission was created, and a definite attempt was made to unify the highways of the state so as to make a complete highway system therein suitable for modern conditions of travel. The highway commission was given large and comprehensive powers, which powers have been added to from time to time up to the present. The system of highway construction carried on since that time has been at a tremendous cost to the state and its municipalities, and it has been carried on under great difficulties. Formerly the highways consisted almost entirely of town highways and a few county high-

ways, but no connected state-wide system. Under the present necessities of travel it was found necessary to have trunk highways so connected as to be able to reach any part of the state, and so improved as to be appropriate for present methods of travel. It became necessary to straighten these highways and to relocate some of them, or parts of them, for that purpose, and to obtain better grades; it became necessary to make easy turns instead of square corners in the highways; it became necessary to widen them in places and to put in stronger bridges and culverts; it was necessary to surface the roads, and on the main trunk highways to put in concrete or other lasting material. To do these things it was necessary to give the highway commission authority to move rapidly and continuously in the development of such highways. The legislation during this time clearly outlines the legislative intent to prevent any unnecessary obstruction to the program. For this reason the legislation must be liberally construed to carry out the legislative intent.

By ch. 175, Laws of 1917 (sub. (1), sec. 1313, Stats.), it was provided:

"The commission shall, as soon as practicable after the passage and publication of this act, lay out a system of main traveled roads, interconnecting every county seat and every city with a population of five thousand and over, which system of roads, when laid out and approved by the commission, shall be known as the 'State Trunk Highway System.' The total mileage of all roads and streets included in the state trunk highway system shall be not more than five thousand miles. Prospective roads as yet not public highways may be included in said system."

The same act also provided that the governor should appoint a special legislative state trunk highway committee to act with the state highway commission in laying out state trunk highways. This act remained unchanged until the revisor's bill in 1923, ch. 108, Laws of 1923. That chapter increased the mileage of the state trunk highway system from 5,000 miles to 7,500 miles, and the sentence "prospec-

tive roads as yet not public highways may be included in said system" was dropped out and the following language was inserted:

"84.02 (1). . . . Said system shall, as far as practicable, coincide with state highways and with the county systems of prospective state highways. But the highway commission may, in its discretion, select other routes if it shall judge that the public welfare would be promoted or public travel benefited by a change in the routes between any two points. . . ."

Also, the following was added:

"84.02 (3) (a). The highway commission may change the trunk highway system if it finds that the public welfare and public travel would thereby be promoted or benefited. . . ."

The legislature of 1923 also passed ch. 320, Laws of 1923, adding two subsections to the revisor's bill, to be known as sub. (7) and (8) of sec. 84.02. Sub. (7) provided that the highway commission was authorized and directed to add an additional mileage to the state trunk highway system, "provided that this additional mileage shall not cause the total mileage on the said system to exceed ten thousand miles. The procedure in laying out the additional mileage shall be, in so far as possible, similar to the procedure followed in laying out the original five thousand mile system." It will be remembered that in the original five thousand mile system, under ch. 175, Laws of 1917, there might be included in such system "prospective roads as yet not public highways."

Pursuant to the authority thus vested in the highway commission and the special legislative state trunk committee, these bodies proceeded to lay out state trunk highway No. 80, which became a part of the 5,000 miles added to the system. In laying out state trunk highway No. 80 the highway commission and the legislative committee included as a part of the highway the plaintiff's toll bridge, including the abutments thereto.

It is contended by the plaintiff that this act on the part of the highway authorities was illegal in so far as it attempted to make plaintiff's property a public highway. We do not so understand. The state had a right to take plaintiff's toll bridge under eminent domain, for the purposes of a public highway. That a toll bridge may be included in the system is made manifest by the provisions of sec. 87.04 (7), to wit:

"Any toll bridge in Wisconsin on the state trunk highway system . . . may be purchased or acquired in the general manner outlined for the construction or reconstruction of bridges under this section. . . . If the state highway commission is unable to agree with the owners of such toll bridge as to purchase price, the said toll bridge may be condemned, by exercising the right of eminent domain. . . ."

The plaintiff's toll bridge is on a state trunk highway. The highway authorities, as we have seen, were directly authorized to include in their layout of state trunk highway systems, prospective roads as yet not public highways. Clearly, the plaintiff's bridge was included as a prospective public highway. To be sure, the state could not possess this property to the exclusion of the plaintiff except by condemnation, but it had that right, and it must be presumed that the highway authorities had that in contemplation when they designated it as a part of the state trunk highway system. Sub. (3) (a), sec. 84.02, Stats., provides:

"The highway commission may change the trunk highway system if it finds that the public welfare and public travel would thereby be promoted or benefited."

The power to make this change has been upheld by this court in *Bosshard v. Hotchkiss*, 190 Wis. 29, 207 N. W. 695. The highway authorities, having properly designated plaintiff's property as a part of the state trunk highway system, then had the authority to change or relocate any part of said highway, including that part which crossed plaintiff's property. Thereafter, by appropriate action, the highway commission did relocate that part of state trunk

highway No. 80 passing over plaintiff's property to the point in question in this litigation, and the relocated highway is now a part of the state trunk highway system as a prospective road as yet not a public highway, and is, and has been since such relocation, subject to be taken under the right of eminent domain and improved as a public highway.

The defendants, in proceeding to erect the bridge under its contract with the state, were the agents of the state and were acting pursuant to the authority given by the state. It is apparent that there was a misconception as to the exact boundary line of plaintiff's property. The Grant county side of the bridge was thought to be located on a public street, but it seems that the pier as constructed actually embraced a portion of the plaintiff's property. It is perfectly apparent that the state of Wisconsin and the contractors were acting in entire good faith. The state had provided by its contract that the defendants should not trespass on the plaintiff's property, but it also provided by the contract that the highway engineer should designate the places where the piers were to be built, and that the contractor followed such designation in building the pier.

Immediately upon the service of the complaint in this action, the state, through the highway committees of Grant and Richland counties, made application to the respective county judges for the appraisal and condemnation of the lands of the plaintiff necessary to its highway construction, and such proceedings were pending during the time of the trial and at the time of the judgment entered herein.

It is conceded that these proceedings were twice adjourned at the request of the plaintiff, and that upon the entry of the judgment herein the county judge of Grant county refused to proceed with such condemnation because of the judgment of the circuit court herein holding such proceedings invalid.

The right of eminent domain in the state does not depend for its existence on a specific grant in the constitution. It is

inherent in sovereignty and exists in a sovereign state without any recognition of it in the constitution. The power is inalienable and no legislature can bind itself or its successors not to exercise this power when public necessity and convenience require it. 10 Ruling Case Law, p. 1, title "Eminent Domain." Hence, when the state is a party, all that is required under the constitution is that the state shall make compensation for the property taken, and it has been held that when the state had provided an adequate method of obtaining compensation, that satisfied the constitutional provision. *Smeaton v. Martin,* 57 Wis. 364, 15 N. W. 403; *Smith v. Gould,* 59 Wis. 631, 18 N. W. 457; *State v. Hogue,* 71 Wis. 384, 36 N. W. 860; *State ex rel. Burbank v. Superior,* 81 Wis. 649, 51 N. W. 1014. The property to be taken is for a public purpose. The highway commission determined the necessity for the taking, and had the power so to do.

The contract under which the Worden-Allen Company and its subcontractor proceeded to construct the bridge provided:

"The right of way required for the new bridge has not been obtained. It will, therefore, be necessary for the contractor to build entirely from the south shore and to conduct his operations in such a way so as not to trespass upon any of the property to be acquired. He shall be required to erect a suitable barrier around the property to be acquired at the south end so as to prevent trespassing. This will permit the contractor to build the west half of the south abutment, and piers while the right of way is being acquired. The necessary right of way will be acquired not later than January 1, 1928, at which time the contractor will have access to the balance of the south abutment and to the north shore. The shaded portions on the blue print attached show the right of way involved."

It appears that part of the south abutment as erected was by mistake placed so as to encroach slightly upon the prem-

ises of the plaintiff. It was apparently assumed by those who drew the contract, and the persons who operated under it, that the plaintiff had no title to the river bed between the banks, and so, against the protest of the plaintiff, the contractor proceeded with the erection of certain piers in the bed of the stream, in the meantime refraining, except by mistake, from in any way trespassing upon any other lands of the plaintiff company. The trial court correctly found that the Worden-Allen Company "trespassed upon plaintiff's property and attempted to build permanent structures thereon on the bed of the river belonging to the plaintiff, and did build part of one pier thereon; that plaintiff immediately and vigorously objected thereto and protested against the defendants so doing, and forbade them to enter or trespass upon plaintiff's property, and that the defendants wilfully and forcibly persisted in so doing, against the protest and objections of the plaintiff and its officers."

It is apparent from the facts in the case that there has not been an actual taking of the plaintiff's property so as to entitle the plaintiff to proceed under the provisions of ch. 32, except as to that part of the plaintiff's premises occupied by the pier erected as hereinbefore stated. It is only where those authorized to exercise the power of eminent domain are actually in the possession of and enjoying the use of property that the owner thereof is remitted to the proceedings under ch. 32.

This makes it necessary to determine the rights of the parties in this case under the provisions of sub. (3), sec. 83.07, Stats., to wit:

"(3) In case the committee or board is unable to acquire such land or right by contract the committee or board may acquire the same in the name of the county or town, as the case may be, by the exercise of the right of eminent domain, as provided in chapter 32 of the statutes or in the following manner: They may, upon not less than five days' notice in

writing, exclusive of Sundays and holidays, to such owner, describing the property and stating the time and place of hearing the application, apply to the county judge of said county to appraise the value of the property sought to be taken. At the time set therefor such judge shall hear the parties, and in such manner as he may in his discretion determine, inform himself in respect to the matter, and within five days, make his award in writing and file the same in his office. The county committee or town board may then pay the sum awarded to the owner by delivering to him a county, or town order, or tender the same, and the title to the property and rights sought to be acquired shall thereupon vest in the county or town board for the uses and purposes of the acquirement, and such committee or board may cause a certificate under the hand and official seal of such judge, stating the facts, to be recorded in the office of the register of deeds."

While the legislature might have provided that the relocation of the highway by the state highway commission should constitute a taking of private property for that purpose, it very carefully refrained from incorporating such a provision in the law, and no doubt for a very good reason. Under the statute as it is written, after application has been made to the county judge and the award of damages has been determined, the county committee may then pay the sum awarded to the owner by delivering to him a county or town order. When a tender is made to the owner of the property, the rights sought to be acquired, by the terms of the statute, vest in the county or town board, as the case may be. The statute as drawn leaves it optional with the public authorities to determine whether or not they will take the land after the amount of the award is fixed. If the application to the county judge amounted to a taking, then, under the authorities, the public officials could not arbitrarily withdraw from the proceeding, and they would probably be bound to pay the award even though it might, in their opinion, be very excessive. *Sprague v. Northern Pac. R. Co.* 122 Wis. 509,

100 N. W. 842; *Brown v. County State Road & Bridge Committee,* 182 Wis. 480, 196 N. W. 860. Even if it should be held that they might abandon the proceedings, they would remain liable for damages. So it is provided in the statute relating to the acquiring of public utilities that the municipality seeking to condemn the property of a public utility may, upon the conditions therein specified, abandon its proceedings if, in its opinion, the damages are fixed at an excessive amount. *Milton v. McGowan W., L. & P. Co.* 176 Wis. 658, 187 N. W. 661.

There certainly was no consent by the plaintiff to the taking of its property at any time or under any circumstances. It at all times vigorously warned the defendants off its property and insisted upon its rights, so that the public authorities, never having given or tendered to the plaintiff a town order, and never having been by consent of the plaintiff in possession of the premises, never took the plaintiff's property under the statute, and the defendants and none of them were legally entitled to the possession of it.

We come now to a consideration of whether or not, under the facts and circumstances of this case, the plaintiff was entitled to an injunction restraining the public authorities from entering upon the premises in question.

Consistent with the public policy of the state with reference to acquiring property under eminent domain, courts of equity should exercise their high prerogatives in accordance with the principles of justice. Equity demands that he who seeks equity must do equity. He must come into court with clean hands. Equity appeals to conscience. It will not issue its writs to oppress, or to hinder and delay justice. We recognize, however, that equity has generally granted injunctions against illegal entry upon private land under color of eminent domain or where such entry is threatened without regard to the customary requirements of equitable jurisdiction. But there are exceptions to the general rule. Mr.

Justice BREWER, when on the bench in the United States circuit court, very clearly and aptly discussed the principles to be applied in equity. He said:

"A chancellor, in determining an application for an injunction, must regard not only the rights of the complainant which are sought to be protected, but the injuries which may result to the defendant or to others from the granting of the injunction. If the complainant's rights are of a trifling character, if the injury which he would sustain from the act sought to be enjoined can be fully and easily compensated, while, on the other hand, the defendant would suffer great damage, and especially if the public would suffer a large inconvenience if the contemplated act was restrained, the lesser right must yield to the larger benefit; the injunction should be refused, and the complainant remitted to his action for damages. This rule has been enforced in a multitude of cases, and under a variety of circumstances, and is one of such evident justice as needs no citation of authorities for its support.

"When the defendant has an ultimate right to do the act sought to be restrained, but only upon some condition precedent, and compliance with the condition is within the power of the defendant, injunction will almost universally be granted until the condition is complied with. This principle lies at the foundation of the multitude of cases which have restrained the taking of property until after the payment of compensation, for in all those cases the legislature has placed at the command of the defendant means for ascertaining the value of the property. In those cases the courts have seldom stopped to inquire whether the value of the property sought to be taken was little or great, whether the injury to the complainant was large or small, but have contented themselves with holding that as the defendant had full means for ascertaining such compensation, it was his first duty to use such means, determine and pay the compensation, and until he did so the taking of the property would be enjoined.

"Where the defendant has an ultimate right to do the act sought to be enjoined upon certain conditions, and the means of complying with such conditions are not at his command,

the courts will endeavor to adjust their orders so on the one
hand as to give to the complainant the substantial benefit of
such conditions, while not restraining the defendant from
the exercise of its ultimate rights. Thus, in the case at bar,
the defendant has of course the ultimate right to grade this
street. As a condition of such right is a payment of dam-
ages, but it has no means of ascertaining those damages; no
tribunal has been created, no provision of law made, for
their ascertainment. Hence, if possible, the court should
provide for securing to the defendant this ultimate right,
and at the same time give to the complainant the substantial
benefit of the prior conditions.

"In applying the rule first stated to a case like the one at
bar the court should have principal regard to three matters:

"(1) The amount of injury to the complainant. It is
obvious that a grade of a single foot in front of a city lot
would work but trifling injury, while on the other hand the
grade might be such as practically to destroy the value of the
adjacent property. In the one case it would seem a great
hardship to tie up public improvement because of some tri-
fling injury to the complainant, the amount of which injury
was not attainable by any established means, and therefore
that the party might justly be left to his action for damages;
while in the other case the court might well insist that
the value of complainant's property should not be wholly
wrecked until such value has been paid to him.

"(2) The court will consider the solvency of the defend-
ant. If some irresponsible corporation should seek, in the
exercise of the power of eminent domain, and under the
guise of the contemplated public improvement, to do serious
damage to property, the court should properly say that the
owner was not bound to take the chance of collecting his
damage from such a corporation, and imperatively require
the prior adjustment and payment of such damages; while,
if the party attempting the improvement was a corporation
of established and permanent solvency, the court might say
that the complainant would run little risk in pursuing simply
his action for damages.

"(3) If the improvement was one of great public im-
portance, the court would justly regard that as a reason for
not lightly interfering with the work, while if the improve-
ment was more of a personal speculation and for private

gain, the prior protection of the complainant would be most rigorously insisted on. Thus, if in the center of a large and thriving city like the defendant some improvement was contemplated which the necessities of business proclaimed to be urgent, the court on no slight consideration should interfere to delay or restrain it; while, on the other hand, if it was some matter in the outskirts of the city, having obviously principal reference to the private speculation of the individual, and of no earnest or urgent demand of public good, the attention of the court would be properly directed to the full protection of the complainant's prior right. I think such considerations as these, and others of a similar nature, when properly regarded by the courts, will afford ample protection to individual rights, without unnecessary interference with needed public improvements; and that until the legislature makes suitable provision for the ascertaining of damages to property not taken, the courts should be guided by them in determining all applications of this nature for an injunction." *McElroy v. Kansas City,* 21 Fed. 257.

In *New York City v. Pine,* 185 U. S. 93, 22 Sup. Ct. 592, is found an illustration of the application of equity to the conditions there existing. A river rising in the state of New York and flowing through the state of Connecticut was dammed in New York by the city of New York to furnish water for the city supply. This resulted in diverting the water from its course in Connecticut to the damage of a couple of farmers whose farms bordered on the stream. They sought to enjoin the city in the federal court, and the lower court granted the injunction. The supreme court considered the equities, and directed the lower court to ascertain the damages and upon tender of payment by the city to deny the injunction. Clearly, the plaintiffs' legal rights had been infringed, but the court recognized that they could be equitably compensated and that the public rights were superior if compensation was paid.

As stated in 14 Ruling Case Law, p. 449, injunctions against a trespass are sometimes refused because the hardship, injury, or inconvenience which they would cause the

defendant are out of all proportion to the benefit they would bring to the plaintiff, and for this reason courts have, in some instances, refrained from restraining the commission of a trespass where the injunction would result in little or no benefit to the plaintiff and would cause great inconvenience and expense to the trespasser.

In *Colby v. Spokane,* 12 Wash. 690, 694, 42 Pac. 112, the court said:

"The remedy by injunction is to a certain extent within the discretion of the court, and where, as in this case, it appears that such proceedings were being taken as would soon take from plaintiffs the title to the property and give them full compensation therefor, the fact that by premature action a trespass might have been committed would not, unless coupled with facts not made to appear by this complaint, entitle them to an injunction. The only ground upon which, under the allegations of this complaint, an injunction could be granted would be that it was necessary to prevent a multitude of suits. But the facts alleged in the answer were such as to negative the idea that such would be the result of a refusal of equitable relief. It was not made to appear that the defendant, the city of Spokane, was insolvent, or that full compensation for the illegal acts charged could not be had in an action at law."

In *Davis v. Port Arthur C. & D. Co.* 87 Fed. 512, the rule is stated in the syllabus:

"An application for an injunction *pendente lite* is addressed to the sound discretion of the court, and will be granted only to prevent irreparable injury; hence a corporation having instituted proceedings for the condemnation of land, and a controversy having arisen as to the value thereof, an injunction will not issue to restrain the corporation from entering upon the land until the termination of the condemnation suit, where the corporation has given bond in a sum sufficient to cover all damages, and the whole controversy appears to be rather an attempt to defeat the purpose of the corporation than a simple contest as to the value of the land."

That decision is very apropos to the case at bar.'

The same idea is well illustrated in a number of cases in our own state. In *Janesville B. Co. v. Stoughton,* 1 Pin. 667, 673, it is said:

"To entitle a party to an injunction or to the exercise of chancery powers, it is well settled, that there must be such an injury, as from its nature is not susceptible of being adequately compensated by damages at law. 2 Story's Eq. sec. 204. It must be a case of strong equity and imperious necessity. There must be something peculiar in the case, so as to bring the injury under the head of quieting possession, or to make out a case of irreparable mischief. The complainant must have a vested right, either legal or equitable, which may be greatly, if not irreparably, affected by the act sought to be restrained. 6 Johns. Ch. 46."

In *Trustees of German Evangelical Cong. v. Hoessli,* 13 Wis. 388, 395, it is stated:

"The general rule undoubtedly is, that in cases of private trespass an injunction would not be granted, for the reason that the aggrieved party had an adequate common-law remedy by action, where proper damages could be assessed by a jury. In ordinary cases this was found to be sufficient for the protection of property. 'But in cases of a peculiar nature, where the mischief was irremediable, which damages could not compensate, or where the injury reached to the very substance and value of the estate, and went to the destruction of it in the character in which it was enjoyed,' then the courts of equity would grant an injunction to prevent the injury complained of." Citing cases.

In *Bright v. Superior,* 163 Wis. 1, 17, 156 N. W. 600, this court, by Mr. Chief Justice WINSLOW, said:

"So we meet the question whether an enterprise involving a great public benefit both to the municipality and the people of an important city should be halted and killed by the courts at the suit of an individual citizen whose abstract rights have been infringed upon, but who will either suffer no injury or whose injury will be inconsequential and conjectural. This

question has been met by numerous courts including our own and has been universally answered in the negative. In *Mahler v. Brumder,* 92 Wis. 477, 66 N. W. 502, at page 486 it was said: 'Equity should not be successfully invoked merely to inflict injury or damage to the defendant, without securing any substantial right or benefit to the plaintiff;' and in the recent case of *Gimbel Bros. v. Milwaukee Boston Store,* 161 Wis. 489, 154 N. W. 998, it is said: 'The present or threatened injury must be real and not trifling, transient, or temporary. . . . Courts generally exercise their discretion against issuing an injunction, where it will produce great public or private mischief, merely to protect technical, doubtful, or unsubstantial rights,' citing many cases from other jurisdictions. See, also, *Schuster v. Milwaukee E. R. & L. Co.* 142 Wis. 578, 126 N. W. 26. This doctrine seems to us eminently sane and sensible. It seems that it is not always remembered that courts are instituted and maintained not for the purpose of delicately poising the scales of abstract logic and recording results, but rather of aiding in the attainment of the ends of government by vindicating rights that are real. Especially is this true of a court of equity. In a case like the present its function is unquestionably to prevent a substantial wrong to the citizen, not to use its high powers to prevent an act which merely infringes upon an abstract or theoretical right but causes no substantial injury to any one; and in this latter situation the court, it seems, may well consider as controlling the fact (if it be a fact) that the threatened act will result in a substantial benefit to the municipality and its people generally."

In that case the plaintiff had a clear legal right, but the court balanced the rights of the parties and held that the plaintiff's legal right was insufficient to entitle him to an injunction whereby the public would sustain more serious damage. Bright was awarded damages of $500 and the action was dismissed. The damages there awarded were equal to the assessed value of the land proposed here to be taken.

The plaintiff relies on *Metropolitan Inv. Co. v. Milwaukee,* 165 Wis. 216, 161 N. W. 785, as sustaining its right to the injunction. In that case the only matter at issue, as

discussed in the opinion, was the question of title. The equities of the situation were not considered. There the statutes on eminent domain were not the same as here, and the facts were different. The case involved the general rule as we have stated it.

We think it is unnecessary to pursue these cases further. Equity is constantly adapting its orders to meet new conditions and new situations. Its aim is to do substantial justice, and it looks to all the facts and circumstances of a case in order to reach that result.

In the instant case the plaintiff's lands, appropriated and sought to be appropriated for the highway, as assessed for taxation and as shown by affidavits, were of small value; the plaintiff, by injunction in a former case, had unlawfully restrained proper proceedings to construct the bridge and had thereby delayed the work; the plaintiff's toll bridge had been for a long time insufficient to sustain loads of modern capacity; the trespass of the state on the plaintiff's property was not wilful but committed through error; proper proceedings were promptly begun to acquire the property by condemnation upon learning the facts; these proceedings were delayed by the plaintiff; the money to build the bridge had been raised by bond issue, and was being held awaiting progress of the work; the contractors, agents of the state, have been put to great expense by reason of such injunction; the state was and is anxious to fully compensate the plaintiff for its property taken and to be taken; the right to take the property is undoubted; plaintiff's remedy in the law has been adequate at all times and prescribed by statute; the improvement is for a purely public purpose; no irreparable damage to plaintiff can possibly be done by permitting the work to go on; the property is vacant and unimproved. In view of all these facts, no injunction should have issued.

The state and Richland county, by proper and timely petition, asked the court to be admitted as parties defendant in

the action. The state was a party to the relocation of the highway. It was a party to the contract to build the bridge, and it was required to pay a portion of the cost of construction of the bridge. The county of Richland was required to pay a portion of the cost of construction, and was a party to the condemnation proceedings. The court denied the petitions. The statute provides:

"Sec. 260.19 (1). The court may determine any controversy between the parties before it, when it can be done without prejudice to the rights of others or by saving their rights; but when a complete determination of the controversy cannot be had without the presence of other parties, or any persons not parties to the action have such interests in the subject matter of the controversy as require them to be made parties for their due protection, the court shall order them to be brought in; . . .

"(4) This section shall be liberally construed in order that, so far as practicable, all closely related contentions may be disposed of in one action, even though in the strict sense there be two controversies, provided the contentions relate to the same general subject and separate actions would subject either of the parties to the danger of double liability or serious hardship."

Under these sections it clearly .appears that the court should have granted the petitions of the state and Richland county to be made parties defendant.

The village of Muscoda and the town of Eagle also applied by petition to be made parties, which petitions were also denied. We think as these municipalities were liable for part payment of the cost of constructing the bridge, and as the proposed bridge would connect the highway between the two municipalities, they had sufficient interest to make them proper parties; but if the state and counties were made parties, their interest would be sufficiently protected, so that the order of the court denying their admission was not an abuse of discretion.

It is assumed that upon the entry of the judgment in the circuit court, in accordance with this opinion, the proceed-

ings to condemn before the county court will be brought to a speedy close.

*By the Court.*—The orders denying the petitions of the state and county of Richland to be made parties to the proceedings are reversed. The orders denying the petitions of the village of Muscoda and the town of Eagle to be made parties are affirmed. The judgment of the circuit court is reversed, with directions to dismiss the complaint.