RANDALL and others, Trustees, Respondents, vs. CITY OF MILWAUKEE, Appellant.

*May 10—September 12, 1933.*

For the appellant there was a brief by *Max Raskin,* city attorney, *William F. Quick,* first assistant city attorney, and *Alfred R. Gandrey,* assistant city attorney, and oral argument by *Mr. Quick* and *Mr. Gandrey.*

For the respondents there was a brief by *Wood, Warner & Tyrrell,* attorneys, and *Jackson M. Bruce* of counsel, all of Milwaukee, and oral argument by *Mr. Bruce.*

The following opinion was filed June 6, 1933:

FRITZ, J. This appeal is from a judgment enjoining the city of Milwaukee from erecting a structure to shelter the entrance to a subway on West Wisconsin avenue in front of the plaintiffs' property, which has a frontage of sixty feet on the south side of that street, until the city acquires the right to erect such structure by condemnation or other proceedings, in accordance with due process of law. West Wisconsin avenue, as dedicated for street purposes on plats recorded in 1869 and 1870, is 100 feet wide. Of that width, 25 feet adjacent to the property lines on each side of the street are used for sidewalks and grass plots, which extend to the curbs; and between the curbs there is a 50-feet-wide roadway, which is used for vehicular traffic. The common council of the city duly determined to construct a tunnel underneath the surface of West Wisconsin avenue for pedestrians crossing that street at North Thirteenth street; and also to erect a building to shelter the entrance and stairway down to that tunnel on the south side of Wisconsin avenue. That stairway and shelter are to be six feet south from the curb, in the grass plot and sidewalk, in front of the east thirty feet of plaintiffs' property. The shelter is to

be 23½ feet long, 8 feet wide, and its height is to be "stepped down" from about 11 feet to 5 feet above the sidewalk.

The trial court found that the proposed shelter will, in a substantial degree, obstruct and interfere with the ingress and egress to and from the east thirty feet of plaintiffs' property and the street in front thereof; with the view from the first story of any store or apartment building which may be erected on the plaintiffs' property, as well as the view of any store windows or other windows in any building on the plaintiffs' premises from the street in front thereof; with easements of light and air, of abutting owners; and that it will result in substantial injury and damages to the plaintiffs, as the owners of the property. The court also found and concluded that the erection of such a permanent shelter over the subway entrance, in the public sidewalk in front of plaintiffs' property, is an unreasonable interference with plaintiffs' property rights; an unreasonable use of the public highway; and will constitute an additional servitude upon the plaintiffs' property which was not within the contemplation of the parties at the time of the original dedication of the street to public use. The city, however, contends that the proposed shelter is necessary as a suitable covering over the subway entrance; that the shelter, as well as the subway, is incidental to the ordinary use of the street, and to facilitate safe travel thereon; that there is no departure from the original purpose of the dedication of the street; and that there is no additional servitude upon the abutters' land, and no taking of property requiring any compensation. Plaintiffs, on the other hand, contend that they have certain property rights, such as the easements of access and view, which the city will impair by an unusual and unreasonable use of the street; and that, consequently, the city's act will constitute a taking of such property rights for public use, without compensation, in violation of plaintiffs' constitutional rights.

This court has recognized that an owner of land abutting on a street has the right, as an incident to his ownership, whether he or the public owns the fee to the center of the street, (1) of access, i. e. egress and ingress, (2) of light and air, (3) of view, (4) to have the street kept open and continued as a public street for the benefit of his abutting property, and (5) to whatever adds to the value of the street to the abutter. *Park Hotel Co. v. Ketchum,* 184 Wis. 182, 185, 199 N. W. 219. However, his rights as an abutting owner are subject to such public street use and purpose as the location of the street requires.

"The primary use and purpose is public travel. The servitude imposed on the land is the right of the public to construct and maintain thereon a safe and convenient roadway, which shall at all times be open and free for public use as a highway." *Krueger v. Wisconsin Telephone Co.* 106 Wis. 96, 102, 81 N. W. 1041.

As this court said in *La Crosse City R. Co. v. Higbee,* 107 Wis. 389, 397, 83 N. W. 701:

"When a new mode of using the public streets and highways is adopted, the question arises of whether it violates the rights of the owners of the fee to the streets and is inconsistent with the original design in setting the land aside for a public thoroughfare, keeping in view the fact that such design is presumed to have contemplated the adoption from time to time of improvements in mechanical appliances and their use in aid of travel upon the street,—the keeping abreast with the march of civilization, with the growth of population and consequent increase of travel, so as to adequately satisfy public needs and conveniences. Lands are set aside for public streets and highways, not for the present, with its necessities and modes of use, but for all time, with all the added demands that may be made upon the public ways within the scope of their original design, in the course of natural development that is constantly going on."

As was said in *McCandless v. Los Angeles* (Cal. App.) 296 Pac. 895, 897, in an action to recover consequential

damages, caused by the construction of a pedestrian subway entrance on the sidewalk of a street in front of plaintiff's abutting property:

"The trend of judicial opinion in the matter under consideration is that a general dedication of a street or highway to public use ordinarily is all-inclusive in character, and, at the time such dedication becomes effective, embraces, not only any and every use then known, practiced, or even conjectured either by the general public or by private individuals for the moving, carriage, locomotion, transportation, or conveyance of either persons or property of any kind, but as well includes any other or additional reasonable use either of a similar or of a dissimilar kind, nature, or character which thereafter may be discovered for the benefit or welfare of the traveling public."

So, in *Hobart v. Milwaukee City R. Co.* 27 Wis. 194, the use of a street for street railway purposes was held not of itself to impose an additional burden upon the fee; and in *La Crosse City R. Co. v. Higbee, supra,* a similar conclusion was reached as to poles set at the edge of a street to support the trolley wires of an electric street railway, but that "reasonable regard must be had, in locating such poles, for the convenience of abutting property owners in the enjoyment of their property."

In *Palmer v. Larchmont Electric Co.* 158 N. Y. 231, 52 N. E. 1092, the court said in relation to placing electric wires and poles in the streets for lighting them:

"The care, management, and control of the public ways devolve upon the local municipal government in which they are located, and it is the duty of the local government to maintain them in such condition that the public, by the exercise of due care, may pass over them in safety." (Page 234.)

". . . The authorities of his town having determined the necessity for the light and contracted with the defendant to furnish it, and the light being for a street purpose, we think no burden is placed upon the fee that was not within the

implied contemplation of the parties at the time the land was taken and dedicated to highway purposes." (Page 238.)

Likewise a subway, when deemed necessary by a municipality to relieve traffic congestion or to promote safety in public travel, has been held a proper street use and therefore not an additional servitude, when constructed for the use of the public by a municipality in its governmental as distinguished from its proprietary capacity. *Sears v. Crocker,* 184 Mass. 586, 69 N. E. 327; *Hayes v. Handley,* 182 Cal. 273, 187 Pac. 952; *McCandless v. Los Angeles* (Cal. App.) 296 Pac. 895, 897; *Id.* 214 Cal. 67, 4 Pac. (2d) 139, 141; *Northern Transportation Co. v. Chicago,* 99 U. S. 635; *In re Application of Rapid Transit R. R. Comm'rs,* 197 N. Y. 81, 90 N. E. 456. Thus, in *Sears v. Crocker, supra,* the court said:

"The question whether the construction of the tunnel will create an additional servitude upon the plaintiffs' lands in the public streets lies at the foundation of these cases, and should be answered at the outset. . . . Our system, which leaves to the landowner the use of a street above or below or on the surface, so far as he can use it without interference with the rights of the public, is just and right, but the public rights in these lands are plainly paramount, and they include, as they ought to include, the power to appropriate the streets above or below the surface as well as upon it, in any way that is not unreasonable, in reference either to the acts of all who have occasion to travel or to the effect upon the property of abutters. . . ." (Page 587.)
". . . The new method is a substitution in part of a subterranean use of the streets for a use of their surface for the same general purpose. . . . We are of opinion that this use of the streets is within the purposes for which the lands were taken and that no additional servitude is created by it." (Page 589.)

In *Re Application of Rapid Transit R. R. Comm'rs, supra,* although it was held that the use of a subway for the opera-

tion of a railway by a city in its proprietary capacity was not a street use, the court said:

"A street purpose, on the other hand, is exclusively a highway purpose, and any use of the street which improves or benefits it as a highway is a proper street use. . . ." (Pages 97, 98.)

"The subway occupies a part of the street, which, although beneath the surface, might, by proper construction and change of grade, be used for ordinary highway purposes and traveled upon freely, without license or recompense, by persons using their own vehicles or their own methods of transportation. . . ." (Page 99.)

"The result of the principle thus announced, as applied to the case in hand, is obvious. If the use were for a street purpose the city would not be liable for damages caused by proper construction in any case where it took no land. A city may change the grade of the street by so cutting it down as to cause the bank forming a natural support to the premises of the abutting owner to fall in without liability if the work is done without negligence or malice and no land is actually taken, as was held in *Radcliff's Ex'rs v. Mayor, etc.* 4 N. Y. 195. Under like circumstances it may build a huge sewer, even if the same result follows, or construct an elevated viaduct, or two-story street for ordinary public travel, without liability. *Uppington v. City of New York,* 165 N. Y. 222, 59 N. E. 91; *Sauer v. City of New York,* 180 N. Y. 27, 72 N. E. 579." (Page 99.)

In connection with a subway for pedestrian travel there must, of course, also be a stairway, and an entrance from the street surface, and both must be as safe and adequate as the nature of the improvement will reasonably permit. For those purposes, it is reasonable and within the power of a municipality to properly protect such stairway and entrance against snow and ice, which in this climate may often endanger the use thereof by pedestrians, by providing a proper shelter over that entrance. When the city authorities have determined that the proposed shelter is necessary for the

safety and comfort of public pedestrian travel, the erection and maintenance thereof is a proper street use. No additional burden is thereby placed upon the fee, which was not within the implied contemplation of the parties at the time the land was dedicated for highway purposes.

Although plaintiffs may sustain consequential damages in so far as that street improvement will somewhat obstruct or interfere with ingress and egress, and the view to and from their land to the vehicular traveled portion of the street, that is not a taking of private property for public use, within the inhibition of such provisions as sec. 2 of art. XI, and sec. 13 of art. I, Wis. Const. As was said in *Sauer v. City of New York,* 180 N. Y. 27, 33, 72 N. E. 579:

" 'But acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the state or its agents, or give him any right of action. This is supported by an immense weight of authority.' "

That has been the rule in this state. *Alexander v. Milwaukee,* 16 Wis. *247, 264; *Dore v. Milwaukee,* 42 Wis. 108, 116; *Smith v. Eau Claire,* 78 Wis. 457, 459, 47 N. W. 830; *Colclough v. Milwaukee,* 92 Wis. 182, 185, 65 N. W. 1039. To avoid that consequence, corresponding provisions in the constitutions of some states have been extended to include property "damaged for public use, as well as property taken for such use." *Chicago v. Taylor,* 125 U. S. 161, 8 Sup. Ct. 820, 31 Lawy. Ed. 638; *McCandless v. Los Angeles,* 214 Cal. 67, 4 Pac. (2d) 139; *Clemens v. Connecticut Mut. Life Ins. Co.* 184 Mo. 46, 82 S. W. 1, 67 L. R. A. 362; *Minnequa Lumber Co. v. Denver,* 67 Colo. 472, 186 Pac. 539; *Pause v. Atlanta,* 98 Ga. 92, 26 S. E.

489; *Gillespie v. South Omaha,* 79 Neb. 441, 112 N. W. 582; *Gray v. Ramsay,* 117 Wash. 255, 200 Pac. 1074, 204 Pac. 4; *Chicago v. Webb,* 102 Ill. App. 232.

However, in the absence of such a change in the provisions, as worded in the constitution of this state, resulting consequential damages do not constitute a prohibited taking of property, because of which a municipality cannot, in the exercise of its governmental powers, proceed with installing an improvement for a proper street purpose on land theretofore lawfully taken as a street, until it shall, first, have acquired, by condemnation or similar proceedings, the right to install such improvement. As the court said in *Selden v. Jacksonville,* 28 Fla. 558, 10 South. 457, 464, 14 L. R. A. 370:

"If what is sought to be enjoined is only an application of the street to additional street purposes, there is, in the absence of any physical invasion of the abutting lots, no taking or appropriation of any property, or right of way of complainants, within the meaning of the prohibition of the constitution."

As the land upon which the proposed shelter is to be erected by the city in its governmental capacity has heretofore been acquired and taken for street uses by the city, there is no occasion for further condemnation proceedings on its behalf, as would be necessary under sec. 80.47, Stats., if some private corporation, which is otherwise authorized by law to acquire property or rights by condemnation, desired to use or partially obstruct a public highway. However, in so far as that statute provides that "No town, city, county, company or corporation shall close up, use or obstruct any such highway, street or alley or any part thereof so as to materially interfere with its usefulness as a highway or so as to injure or damage property abutting thereon on either side, or authorize or permit the same to be done

without due compensation being made for any damage resulting therefrom to the owners of any property upon both sides of the part of such highway, street or alley so closed up, used or obstructed, . . ." the city may be liable to plaintiffs for such consequential damages as may result to their abutting property in so far as the shelter will be an obstruction in the street. It has been held that that provision "was intended to give a remedy for the incidental damages to abutting land, no part of which is taken, and which before were not recoverable." *Kuhl v. Chicago & N. W. R. Co.* 101 Wis. 42, 77 N. W. 155. Likewise in *Smith v. Eau Claire,* 78 Wis. 457, 462, 47 N. W. 830, it was recognized that that provision imposes liability for consequential damages upon municipalities who "close up, use, or obstruct" highways so as to materially interfere with their usefulness as such, or to the injury or damage of property abutting thereon on either side, but the statute was held inapplicable to a lawful change of grade. The court then said: "The lawful change of the grade of a street is not a closing up, or use, or obstruction of a street within the meaning of this statute. Manifestly, it was not intended to reach a case like this. Had it been so intended, it is reasonable to believe that very different and more specific language would have been employed to express such intention;" and that decision was followed in *Colclough v. Milwaukee,* 92 Wis. 182, 187, 65 N. W. 1039. Subsequently, in *Voigt v. Milwaukee County,* 158 Wis. 666, 668, 149 N. W. 392, sec. 80.47, Stats., was held to confer upon an abutting owner the right to recover consequential damages from Milwaukee county because of the erection by the county of a viaduct, no part of which was on his land, but which rested on the north half, and the overhang of which extended slightly above the south half of a public highway on which his land abutted.

However, even if sec. 80.47, Stats., is applicable in the event of the erection by the city of the shelter in question,

the plaintiffs will have only a legal right to recover consequential damages, and not a right to demand compensation as for any taking of their land.  Under those circumstances, it has been held generally, and we believe the better rule to be, that, as the abutting owners have an adequate remedy at law, equity should not interfere to enjoin a municipality from proceeding with making a necessary public improvement in its governmental capacity.  *Lemon v. Garden of Eden Drainage Dist.* 310 Mo. 171, 275 S. W. 44; *Blackwell v. Lee's Summit,* 326 Mo. 491, 32 S. W. (2d) 63, 65; *S. D. Childs & Co. v. Chicago,* 279 Ill. 623, 117 N. E. 115; *Clemens v. Connecticut Mut. Life Ins. Co.* 184 Mo. 46, 60, 82 S. W. 1, 67 L. R. A. 362; *Fellowes v. New Haven,* 44 Conn. 240, 251; *O'Rourke v. Orange,* 51 N. J. Eq. 561, 26 Atl. 858; *Dynes v. Kilkenny,* 153 Minn. 11, 189 N. W. 439; *Edwards v. Thrash,* 26 Okla. 476, 109 Pac. 832, 138 Am. St. Rep. 975; *Osborne v. Missouri Pac. R. Co.* 147 U. S. 248, 259, 13 Sup. Ct. 299.

The Wisconsin cases which have been cited by counsel are not in point.  Only in two of them, viz. *Church v. Joint School Dist.* 55 Wis. 399, 13 N. W. 272, and *Metropolitan Investment Co. v. Milwaukee,* 165 Wis. 216, 161 N. W. 785, were public corporations involved, and in each of those cases the act enjoined was the unlawful taking of land which had not, theretofore, been dedicated or acquired for any public use.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment dismissing the complaint.

A motion for a rehearing was denied, with $25 costs, on September 12, 1933.