HOWELL PLAZA, INC., Plaintiff-Appellant, v. STATE HIGHWAY COMMISSION, Defendant-Respondent.

Supreme Court

*No. 76-545. Submitted on briefs October 10, 1979.—Decided November 6, 1979.*
(Also reported in 284 N.W.2d 887.)

For the appellant the cause was submitted on the brief of *Jeffrey S. Schuster* and *Stupar, Gollin & Schuster, S.C.,* of Milwaukee.

For the respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Charles A. Bleck,* assistant attorney general.

BEILFUSS, C.J. The appellant Howell Plaza, Inc., hereinafter petitioner, acquired a sixty-acre parcel of land located at the corner of Howell Avenue and Puetz Road in the City of Oak Creek in 1959. Approximately ten or eleven acres of this property has been developed with a bank, post office building, shopping center and fast food operation occupying one corner of the tract. The rest of the land remains vacant.

The petitioner, through its president and primary stockholder, Reuben Kritzik, testified that it first became aware of the proposed highway project known as the "Belt Freeway" in 1967 or 1968 through the news media and Oak Creek city officials. As proposed, the freeway was to be approximately 33 miles in length, running from the proposed lake freeway in Oak Creek to a junction with Highway 41 in Washington County. The path of the freeway was to pass through the undeveloped portion of petitioner's property, taking about sixteen acres therefrom. It is only this sixteen-acre portion that petitioner claims the highway commission has taken.

On December 17, 1969, the State Highway Commission approved the corridor. Approval by the Milwaukee Coun-

ty Board and the Federal Highway authorities followed on March 10, 1970 and July 21, 1970, respectively.

Harvey Shebesta, district engineer for the Highway Division of the Wisconsin Department of Transportation, testified that the normal procedure following corridor approval by the appropriate authorities included the employment of a consultant to prepare preliminary plans and alternative preliminary plans, the development of an environmental impact statement (EIS), distribution of the EIS for comment, public hearings on the freeway design, alternate designs and the EIS, and preparation of a final EIS along with recommendations for design specifications for submission to the Federal Highway Administration for approval. Following approval of the EIS and design specifications, plans for the preparation of contract documents and for the identification of the real estate required for the project were to be developed.

Shebesta also testified the commission had developed procedures whereby a property owner whose property was eventually to be taken for highway purposes could request early acquisition. The property owner had to establish that because of an extensive planning period the beneficial use would be severely curtailed and that he would suffer serious hardship if he was required to keep the land without early acquisition. It was also necessary to establish the property in question was within the corridor required for the highway project.

The commission had acquired four parcels within the proposed Belt Freeway corridor from owners who claimed hardship under these procedures.

On July 30, 1970, the petitioner Howell Plaza, through its president Reuben Kritzik, requested that the commission purchase the sixteen-acre tract under its early acquisition procedures. Shebesta testified as of that time no EIS had been prepared; however, preliminary work was undertaken for acquisition of the petitioner's land located

in the freeway corridor prior to the EIS statement in response to the petitioner's request.

In a letter dated July 28, 1971, the commission advised petitioner that engineering had progressed to the point where acquisition would be possible. On August 18, 1971, the commission informally approved acquisition of petitioner's property as a hardship acquisition, and further approval was given by the State Department of Local Affairs and Development on October 21, 1971. Two appraisers were appointed by the commission to appraise petitioner's property.

From then until late 1972 petitioner repeatedly contacted either the appraisers or other representatives of the commission. Finally, in a letter dated January 25, 1973, petitioner was informed by the commission that all efforts to purchase its property had been terminated as a result of government investigation into the legality of the commission's early acquisition procedures.

On March 20, 1973, petitioner commenced this inverse condemnation action under sec. 32.10, Stats., and Art. I, sec. 13 of the Wisconsin Constitution in the Circuit Court for Milwaukee County. A motion to dismiss was filed, heard, overruled, and an appeal taken. This court reversed in *Howell Plaza, Inc. v. State Highway Comm.*, 66 Wis.2d 720, 226 N.W.2d 185 (1975). Petitioner filed an amended petition and the case was tried to the Circuit Court on March 17 and April 5, 1976.

Petitioner contends that the State Highway Commission has so acted as to deprive it of all, or substantially all, of the beneficial use of its property. Kritzik testified at trial that as a result of the activities of the commission he was unable to develop the land. He stated that he had contacted several prospective tenants who had expressed interest in locating on his property prior to 1970, but that, as a result of the panned highway project, no one would deal with him. He also testified that he had been

informed by the director of city planning for the City of Oak Creek that he would not be able to obtain a building permit for his property as it would be either denied or delayed due to the freeway project.

The director of city planning himself testified that, in his opinion no building permit would have been issued to petitioner. He stated that this was due to the state and county policy of keeping the property in a vacant condition so that it could be purchased at a lower price than developed property when the highway acquisitions finally occurred.

In fact, however, petitioner never actually applied for a building permit or took any steps toward the development of its property beyond contacting prospective tenants. In both his correspondence with the commission and his testimony at trial, Kritzik referred to his relationship with the commission as one of cooperation, but qualified this by stating that he had no choice but to cooperate in view of the circumstances.

On the basis of this evidence the trial court stated in its findings of fact that, "Petitioner voluntarily withheld development of the area within the designated corridor; that it made no attempt to sell such land; that Respondent did not have the authority to prevent development of these lands and that Petitioner could have developed its land if it had wanted to; that condemnation by Respondent was never threatened." It concluded that petitioner's land had not been taken or occupied by the commission.

The question before us is whether the petitioner's land was taken or occupied within the meaning of Art. I, sec. 13 of the Wisconsin Constitution or sec. 32.10, Stats.

A preliminary issue raised by the parties is whether the trial court's finding that petitioner was not deprived of the beneficial use of its property raises a question of fact,

in which case that finding would be accorded great deference by this court, or one of law. In *Chicago, M., St. P. & P. R. R. Co. v. Milwaukee*, 47 Wis.2d 88, 96, 176 N.W.2d 580 (1970), this court stated that "[w]hen the principal facts in a case are undisputed and the controversy centers on what has been called ultimate conclusions of fact, or conclusions of law," it is not bound by the findings of the trial court.

In the first *Howell Plaza Case* the court defined a "taking" as the deprivation of all, or substantially all, of the beneficial use of one's property. The issue here is whether the facts established at trial meet this standard. This is a question of law in which this court is not bound by the conclusion of the trial court.

It is the law in this state that, in proceedings brought under the power of eminent domain, there must be a taking before there can be a claim for just compensation. *Howell Plaza, Inc. v. State Highway Comm.*, 66 Wis.2d at 725; *More-Way North Corp. v. State Highway Comm.*, 44 Wis.2d 165, 169, 170 N.W.2d 749 (1969). ". . . [I]ncidental damage to property resulting from governmental activities, or laws passed in the promotion of the public welfare, is not considered a taking of property for which compensation must be made." *State ex rel. Carter v. Harper*, 182 Wis. 148, 153, 196 N.W. 451 (1923); *Nick v. State Highway Comm.*, 13 Wis.2d 511, 514, 109 N.W. 2d 71, 111 N.W.2d 95 (1961); *Surety Savings & Loan Asso. v. State*, 54 Wis.2d 438, 443, 195 N.W.2d 464 (1972). This court stated in *Wisconsin Power & Light Co. v. Columbia County*, 3 Wis.2d 1, 6, 87 N.W.2d 279 (1958), that

". . . mere consequential damage to property resulting from governmental action is not a taking thereof. Sec. 13, art. I, Wis. Const., like its equivalent in the federal constitution, 'does not undertake, . . . to socialize all losses,

but only those which result from a taking of property.' *United States v. Willow River Co.*, 324 U.S. 499, 502, 65 Sup. Ct. 761, 89 L. Ed. 1101. Thus impairment of the value of plaintiff's farm by odors from a municipal sewerage-disposal plant is not a taking. *Hasslinger v. Hartland*, 234 Wis. 201, 206, 290 N.W. 647. Nor is partial obstruction of ingress to and egress from plaintiff's property, and the view therefrom, by a municipal shelter a taking of the property. *Randall v. Milwaukee*, 212 Wis. 374, 382, 383, 249 N.W. 73. See also *State ex rel. Saveland P. H. Corp. v. Wieland*, 269 Wis. 262, 267, 69 N.W.(2d) 217. In this connection it is important to observe that while the constitutions of many states provide expressly that private property shall not be taken *or damaged* for public use without just compensation (2 Nichols, Eminent Domain (3d ed.), p. 324, sec. 6.44), that of Wisconsin provides only that 'the property of no person shall be *taken* for public use without just compensation therefor' (sec. 13, art. I, Wis. Const.) without mention of damage."

It therefore follows that petitioner is entitled to compensation only if the conduct of the commission amounted to a taking or occupation of its property.

In *Muscoda Bridge Co. v. Worden-Allen Co.*, 196 Wis. 76, 88, 219 N.W. 428 (1928), this court, in construing a predecessor inverse condemnation statute, held that "[i]t is only where those authorized to exercise the power of eminent domain are actually in the possession of and enjoying the use of property that the owner thereof is remitted to the proceedings under ch. 32."

This rather strict construction of the terms "taking" and "occupying" was modified by this court's decision in the earlier *Howell Plaza Case*. The court there held that "there need not be an actual taking in the sense that there be a physical occupation or possession by the condemning authority" in order for one to bring an inverse condemnation action. 66 Wis.2d at 730. Where a property owner has been deprived of "all, or substantially all, of the beneficial use of [his] property," a taking or occupa-

tion has occurred such that just compensation is due. 66 Wis.2d at 728. Despite this modification of the earlier rule, however, the court in the first *Howell Plaza Case* concluded that petitioner had failed to state a cause of action under sec. 32.10, Stats.

The issue raised in this case is not unlike one faced by a growing number of courts in recent years. The tremendous growth in the number of urban renewal and highway projects in cities across the country has brought to the courts with increasing frequency the issue of who is to bear the losses which often result from the delays in the planning and completion of such projects. The term "condemnation blight" has been coined to denote "the debilitating effect upon value of a threatened, imminent or potential condemnation." 4 Nichols, *Eminent Domain* (3d ed.) sec. 12.3151[5], p. 475. This problem was aptly described by the first trial judge to preside over this case:

" 'The advance planning necessary for public improvements often results in postponements and delays in condemnation proceedings. Long periods of time lapse between the initiation of a project and the actual award of compensation to the property owner. As this delay continues, property values in the area set off for the public improvement sometimes rapidly depreciate, because the tenants relocate in other areas and property owners are reluctant to spend money on repairs. There can be a substantial loss of financial return from such property, while the cost of its maintenance continues. Such effects of proposed public improvements are called condemnation blight. The law of emninent domain has found this a difficult problem to resolve.' " *Howell Plaza, Inc., supra,* 66 Wis.2d at 727–28.

Despite the seriousness of the problem, however, the fact that a property owner has suffered a loss as a result of the announcement and initial planning of a public improvement has not generally been held to constitute a taking of property. The majority rule, as stated in an annotation at 37 A.L.R.3d 127, 132 (1971), is that the

"mere plotting or planning in anticipation of a public improvement does not constitute a taking or damaging of the property affected." In *Danforth v. United States*, 308 U.S. 271, 285 (1939), the United States Supreme Court stated in this regard:

"A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense."

This much petitioner concedes. But where, as here, the condemning authority has done more than merely plan the public improvement and its activities have rendered reasonable use of the property impossible, petitioner contends, a taking has occurred. In addition to planning the freeway, petitioner claims that the commission took definitive action to purchase its land under the hardship procedure, that it actually did purchase several parcels in the immediate area, and that it had the unequivocal intent and desire to prevent development.

Petitioner also concedes that the highway commission had no legal authority to restrain development in the corridor, but argues that it intended and did in fact do so by urging the City of Oak Creek to refuse building permits for property within the corridor. As evidence of this conduct on the part of the commission, petitioner cites a department memo in which the policy with respect to this land was described as follows:

"We solicited and received the assurances of both communities that any proposed subdivision plats or building permits in the path of the freeway would be referred to us prior to any official action. It was and still is intended that all contemplated major improvements in the path of the freeway will be prevented by purchase of the property.

"The property owner finds that he cannot improve on or subdivide his property without our prior approval. He

also finds that because few, if any, buyers are interested in purchasing property in the path of a freeway, he is unable to sell his property on the open market."

Petitioner was also informed by the city planner of Oak Creek that any application for a building permit would be denied. However, the city planner did not have authority to make this decision. Nevertheless the petitioner claims it was unable to develop, build on, or even dispose of its property.

Contrary to the petitioner's claim, however, the trial court found that it could have developed its property if it had so desired, but that it had voluntarily chosen not to. This finding is not contrary to the great weight and clear preponderance of the evidence.[1] Petitioner made no attempt to develop its property other than to inquire as to the feasibility of obtaining a building permit, and this inquiry wasn't even made to a person actually responsible for the issuance of such permits. On cross-examination petitioner's president admitted that he had withheld development of the land within the corridor voluntarily, and that he felt the proposed freeway would enhance the demand for property in the area. The fact that petitioner withheld development of not only the portion of its property lying within the corridor, but also that lying outside of the proposed freeway path, permits an inference that there were other reasons for foregoing immediate development. Because petitioner made no attempt to develop or sell its land, the trial court could rightfully conclude the petitioner was not deprived of all or substantially all of the property's beneficial use.

If the commission had placed a legal restriction upon petitioner such that it was permanently prevented from

[1] *Gimbels Midwest v. Northwestern National Ins. Co.*, 72 Wis.2d 84, 95, 240 N.W.2d 140 (1976); sec. 805.17(2), Stats.

improving its property in any way, a taking would probably have occurred. "Where [a] restriction is so great [that] the landowner ought not to bear such a burden for the public good, the restriction has been held to be a constructive taking even though the actual use or forbidden use has not been transferred to the government so as to be a taking in the traditional sense." *Just v. Marinette County,* 56 Wis.2d 7, 15, 201 N.W.2d 761 (1972). Thus, a taking occurs where "the restriction practically or substantially renders the land useless for all reasonable purposes."[2]

In *State v. Herwig,* 17 Wis.2d 442, 117 N.W.2d 335 (1962), a regulation which prohibited hunting on farmland and thereby turned the land in question into a game refuge was found to be an unconstitutional taking, and in *Public Service Corp. v. Marathon County,* 75 Wis.2d 442, 249 N.W.2d 543 (1977), we recently held that a county's order that a utility remove its power lines from an easement along a town road and relocate them underground constituted a taking which required compensation.

In *Just v. Marinette County, supra,* on the other hand, this court held that an ordinance which prohibited the placing of excess fill upon wetlands lying within 1,000 feet of a lake without a permit was not an unconstitutional taking even though such restriction had the effect of forcing the property owners to maintain their land in its natural state. Although this holding would appear to support the constitutionality of a direct restraint on the right of a landowner to improve his property in any way, it is clear from the decision that the holding is limited to the context of environmental legislation. As the court noted early on in the decision, "What makes this case different from most condemnation or police power zon-

---

[2] *Buhler v. Racine County,* 33 Wis.2d 137, 143, 146 N.W.2d 403 (1966); *Stefan Auto Body v. Highway Comm.,* 21 Wis.2d 363, 369–70, 124 N.W.2d 319 (1963).

ing cases is the interrelationship of the wetlands, the swamps and the natural environment of shorelands to the purity of the water and to such natural resources as navigation, fishing, and scenic beauty." 56 Wis.2d at 16–17.

In another recent case, *Penn Central Transportation Co. v. New York,* 438 U.S. 104 (1978), the United States Supreme Court held that New York City's landmark preservation law, under which a property owner was prevented from constructing a 50-story office building over the Grand Central Terminal which had been designated a landmark, did not unconstitutionally "take" private property without just compensation. The court emphasized in a footnote to its decision however, that its holding was based on the record before it which "in turn [was] based on Penn Central's present ability to use the Terminal for its intended purposes and in a gainful fashion." In fact, the court continued, the city itself had conceded that if Penn Central could demonstrate at some time in the future that circumstances had changed such that the terminal ceased to be " 'economically viable,' " it could then obtain relief. 438 U.S. at 138, n. 36. Since a restriction preventing any development would, in the case before this court, render gainful use of the petitioner's property seemingly impossible, such a regulation would constitute a taking.

Reasoning from these authorities and from those discussed below, it does not follow that such a taking has occurred here. At most, petitioner has been unable to develop his land only temporarily. More importantly, however, it is undisputed that the commission did not impose any such legal restraint upon petitioner or its property. As was stated earlier, the commission had no legal authority to restrain development in the corridor short of actually condemning the property. Without the authority, it clearly could not impose such restraints.

There is no evidence that the commission instructed the City of Oak Creek not to issue building permits in the first place. The memo cited by petitioner indicates just the opposite. According to the department memo, the commission intended to prevent development not by legal restraint, but by purchasing property on which major improvements were planned. It was for this reason that the commission "solicited and received the assurances . . . that any proposed subdivision plats or building permits in the path of the freeway would be referred to [it] prior to any official action."

Under the first *Howell Plaza* decision, however, it is arguable that no legal restraint by the condemning authority is necessary for there to be a taking. Some of the language in the decision is broad enough to allow the finding of a "taking" whenever a property owner is unable to beneficially use his property, even where this is only an indirect result of government action.

"Long delays in actually acquiring property after the public improvements have been announced can result in substantial hardship to property owners, for which they ought in justice to receive compensation. We have no doubt that there can be a cause of action for inverse condemnation if the facts alleged are sufficient to show that property owners so situated have been deprived of all, or substantially all, of the beneficial use of their property." 66 Wis.2d at 728.

However, we also made clear in the decision that its rejection of the absolute rule requiring a physical taking was based upon its more recent decisions where it had held legally imposed restrictions on the use of property could constitute a taking.

"Under the recent cases, the absolute position set forth in the *Muscoda Case*, that there must be an actual physical occupation by the condemning authority, is not the only test of a 'taking.' There can be a 'taking' if a restriction, short of an actual occupation, deprives the owner of all, or substantially all, of the beneficial use of his property." 66 Wis.2d at 726.

In none of those "recent cases" had the court held that, where loss of all, or substantially all, beneficial use is caused indirectly by governmental action, a taking occurs. All of them had involved restrictions upon the use of the property. *See Just v. Marinette County,* 56 Wis.2d 7, 201 N.W.2d 761 (1972). We did not intend in *Howell Plaza I* to expand the definition of "taking" beyond our holding in *Just.* A taking can occur absent physical invasion only where there is a legally imposed restriction upon the property's use.[3]

The requirement that there be a legal restraint by the condemning authority in order for a taking to occur absent physical invasion appears to be the prevailing rule in other jurisdictions. In an often cited case, *City of Buffalo v. J. W. Clement Co., Inc.,* 28 N.Y.2d 241, 269 N.E.2d 895, 321 N.Y.S.2d 345, 357 (1971), the New York Court of Appeals stated:

". . . it is clear that a *de facto* taking requires a physical entry by the condemnor, a physical ouster of the owner, a *legal interference* with the physical use, possession or enjoyment of the property or a legal interference with the owner's power of disposition of the property." (Emphasis added.)

In *Sayre v. City of Cleveland* (6th Cir. 1974), 493 F.2d 64, 69, 70, the Sixth Circuit expressly adopted the *Clement* requirements for a de facto taking and thereby sharply limited an earlier decision from that circuit favoring a less restrictive rule. *See also City of Walnut Creek v. Leadership Housing, Inc.,* 73 Cal. App.3d 611, 140 Cal. Rptr. 690 (1977) ; 4 Nichols, *Eminent Domain* (3d ed.), sec. 3151[5], and *Condemnation Blight and the Abutting Landowner,* 73 Mich. Law Rev. 583 (1975).

---

[3] *See also Public Service Corp. v. Marathon County,* 75 Wis.2d 442, 249 N.W.2d 543 (1977).

A case closely akin to this case is *Kingston East Realty Co. v. State of New Jersey*, 133 N.J. Super. 234, 336 A.2d 40 (1975). In that case a landowner brought an action for damages against the state commissioner of transportation for delaying the issuance of a building permit and inhibiting the development of its land. There, also, a proposed highway project was to run through plaintiff's land and delays in final acquisition of the land needed made development of the property impossible. In addition, plaintiff was denied a building permit by the township because of the action by the department of transportation. Plaintiff urged that the state's actions constituted a de facto taking.

The New Jersey court rejected this contention, holding that—"The planning engaged in by the State involving plaintiff's property, the filing of the alignment map, the acquisition of a nearby parcel, and the refusal to abandon any long-range plan for the eventual acquisition of the property for the proposed highway did not, in actuality, bar plaintiff from utilizing and developing its property." Further, the court concluded there was "no such actual or threatened interference with the use of the property of such a permanent, serious or continuing nature, to justify the conclusion that a 'taking' had occurred." 133 N.J. Super. at 240.

Here, as in *Kingston East Realty*, the commission's actions did not in actuality bar petitioner from developing its property. If petitioner was in fact unable to develop its property, it was not due to any restriction imposed upon it by the commission, but to the uncertainty of the future status of its land. Such uncertainty is often a result of a planned, public improvement which requires the eventual acquisition of private property and does not constitute a taking of all or substantially all of the beneficial use of the property.

*By the Court.*—Judgment affirmed.